# Wytheville

## FRANK T. WALTON, ET ALS. v. MYRTLE I. WALTON AND W. E. WALTON.

June 10, 1937.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Harris, Harvey & Brown* and *Jones & Whitehead,* for the appellants.

*Carter & Williams, Margaret L. Carter* and *Tom Irvin Gill,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

This appeal involves the single question whether or not the learned chancellor was correct in sustaining appellees' motion, made at the conclusion of the introduction of testimony, to strike from consideration of the jury all evidence introduced to determine the following issues:

"(1) Whether the paper writing, dated August 12, 1932, probated *ex parte* as the last true will of John T. Walton, deceased, is in fact the last true will and testament of said John T. Walton, deceased.

"(2) Whether the four alleged deeds, dated August 1, 1932, purporting to be from John T. Walton, deceased, to Myrtle I. Walton, described in paragraph six of the bill of complaint, are valid and sufficient deeds."

No objection is urged in this court to the procedure permitted by the trial court in allowing the validity of the four deeds to be settled in the same proceedings brought to test the validity of the will. Hence the discussion will be made on the assumption that *devisavit vel non* was the only issue raised.

Contestees assumed the burden of proof and introduced the three subscribing witnesses to establish the fact that John T. Walton was, on August 12, 1932, of sound mind and disposing memory, and that the will was executed in due form.

J. William Scruggs, an attorney, and one of the subscribing witnesses, testified that he prepared the will at the direction of the testator, to whom he read the paper after it was typed, and while he and the testator were alone in his private office, he gave it to the testator to read. As soon as Mr. Walton stated that the paper as written was what he desired, Miss Scruggs, a stenographer, and John R. Hagood, a law clerk, both em-

ployed by Mr. Scruggs, were called in to witness the execution, which was done in due form. By this will Mr. Walton devised and bequeathed all of his property, both real and personal, to his wife Myrtle I. Walton, to the exclusion of his son and grandchildren. At the same time Mr. Walton executed four separate deeds of gift, conveying to Myrtle I. Walton four separate tracts of land containing in the aggregate 320 acres, all lying in the same magisterial district in Pittsylvania county.

Mr. Scruggs further stated that the motive which prompted the execution of these voluntary deeds was to make the future safe for the wife of the testator, as some of his creditors were pressing him for payments which he was unable to make at that time. The other subscribing witnesses stated that while neither of them knew the testator very well, he appeared normal to them when he signed the will in their presence. After the introduction of these witnesses, appellees concluded the taking of their testimony in chief.

Appellants then began the taking of their testimony, and introduced more than thirty witnesses to establish mental incapacity and undue influence. A motion to strike appellants' evidence was made at the conclusion of the taking of their testimony, and was overruled. The motion was renewed at the conclusion of the introduction of all evidence, and was sustained. As the affirmative of the issue was on the contestees, their motion was not to strike all of the evidence, but only that offered by appellants. There is some difference between the issue here raised, and the issue in usual common law actions. In the latter, plaintiff has to bear the burden of proof, hence contestees were not in a position to move for the elimination of all evidence, if they desired the will to be probated. *Dickens* v. *Bonnewell*, 160 Va. 194, 168 S. E. 610.

In *Culpeper National Bank* v. *Morris*, ante, page 379, 191 S. E. 764, an opinion announced at this term of court, we said that a motion to strike the evidence on the issue *devisavit vel non*, should be sustained in a proper case. We have said in a number of cases that striking plaintiff's evidence at the conclusion of plaintiff's testimony, and thereby taking the case

from the jury, is drastic and should not be done unless it is very plain that the court would be compelled to set aside a verdict for plaintiff, considering the evidence strictly as upon a demurrer thereto. When a motion to strike is made after all the evidence of both parties has been introduced, "a somewhat more liberal rule is sometimes applied to the consideration of the evidence in passing upon the motion." *Jones* v. *Hanbury*, 158 Va. 842, 164 S. E. 545, 546; *Bray* v. *Boston, etc., Corp.*, 161 Va. 686, 696, 172 S. E. 296.

It seems the above is as definite a statement of the rule applied to the consideration of the evidence on a motion to strike, after all of the evidence has been introduced, as this court has attempted to make. Attention is called to the fact that Code, section 6365, requires this court to "affirm the judgment, decree, or order if there be no error therein, and reverse the same, in whole or in part, if erroneous, and enter such judgment, decree, or order as to the court shall seem right and proper and shall render final judgment upon the merits whenever, in the opinion of the court, the facts before it are such as to enable the court to attain the ends of justice."

▉ Hence after the parties have introduced all available evidence, and the trial court has sustained the motion to strike, on review in this court we examine the evidence to determine whether or not a verdict in behalf of the losing party can be sustained. That is, upon a careful consideration of all the evidence, if we are of opinion that reasonable men may differ on the conclusion to be reached, then it is our duty to hold that the trial court committed error in striking the evidence. The trial court should not sustain this motion in any doubtful case. As pointed out in Burks' Pleading and Practice (3d Ed.) sec. 256, the motion to strike is made in the heat of the trial, while the jury is waiting to receive the instructions and to hear the argument of counsel. Hence the court has but little time in which to consider the evidence. However, on a motion to set aside the verdict the trial court has ample time to give due consideration to, and weigh the evidence. If on review this court does not agree with the judge of the trial court in its action in setting aside the verdict, the verdict is in

the record, and final judgment may be entered by this court. This procedure eliminates the delay and expense of a second trial, speeds final determination of litigation, and removes possible temptation for the commission of perjury on the second trial. These were the main objects contemplated by the 1919 Code revisors in the provisions added to Code, sections 6251 and 6365. Again we emphasize that when evidence has been introduced to sustain an issue and there is doubt in the mind of the trial court as to its sufficiency, that doubt should be resolved against the party making the motion, and the issue submitted to the jury. See *Leath* v. *Richmond, F. & P. Ry. Co.*, 162 Va. 705, 174 S. E. 678.

Viewing the evidence, not as strictly perhaps as on a demurrer thereto, but giving appellants the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom, appellants' case may be stated thus: John T. Walton, when he married his first wife, was a man without means. His wife inherited a small estate. By hard work and careful management, with the active assistance of his first wife, he managed to accumulate approximately one thousand acres of valuable tobacco land, which in 1935 was estimated to be worth from thirty to fifty dollars per acre. In 1928 his first wife died, leaving one son, Willie E. Walton, and six grandchildren, the children of a deceased son. After this date John T. Walton, who had been a periodical drinker, not only drank more frequently and freely, but became an habitual addict to Somnos, a drug containing chloral—25 grains to the liquid ounce. He used this drug, not only when he was recovering from his periodical sprees, but continuously. As Dr. Barksdale said: In 1930 "he was taking it *ad libitum*, he was taking it freely." When some of his relatives and friends tried to persuade him to stop using the drug, he seemed to resent their interference with his use of his resting medicine, as he called it. The habitual use of the drug destroys the brain tissues, and makes one mentally irresponsible and a physical wreck. The effect upon the brain tissues and nervous system is said to be similar to that of opium.

Immediately after his wife's death, the testator's grandson,

Frank Walton, with his family, moved into the mansion house, where he kept house for, and looked after, his grandfather until November 12, 1930. On October 10, 1930, John T. Walton made a will giving $500.00 to the Masonic order and $500.00 to the local Baptist church, and the residue of his estate, worth, according to some witnesses, $50,000.00, to his son and grandchildren. On October 15, 1930, while attending a fair in Danville, John T. Walton, then in his 75th year, met Myrtle I. Brown, a widow, whose first husband had been dead less than a year. She had been earning $14.50 per week, as an employee of the Dan River Cotton Mills, but due to the fact that the employees of these mills were then on a strike, she was not working anywhere. Soon after she met Mr. Walton she stated to Mrs. Abbott, who occupied the same apartment with her, that she wanted to marry Mr. Walton, "so that she would have somebody to take care of her so she wouldn't have to work." On November 12, 1930, less than thirty days after she met John T. Walton, she married him, and immediately went to live with him on his farm. Thereafter storm clouds appeared on the family horizon.

On the date of the marriage, Frank Walton was in Canada. His wife did not think that two families could live harmoniously in the same house, so while her husband was away she moved out of the grandfather's home into a smaller house on the premises. In March 1931, Frank Walton and his family moved to Canada, where they remained a year or more. The son, Willie E. Walton, and the unmarried grandchildren who had been living free of rent on the farms owned by John T. Walton, were not treated as cordially after the second marriage as they had been before, and saw less and less of John T. Walton. While the family ties between the son, the grandchildren, and John T. Walton were somewhat strained, Myrtle I. Walton said to her husband in the presence of others, that the grandchildren didn't think anything about him, and he needn't bother about them.

Prior to the second marriage John T. Walton, when sober, had been a good farmer and a shrewd man in his business deals. He seemed to have been devoted to his son and grandchildren,

and advanced considerable monies for their benefit. He, without assistance, had always managed his farms, sold his crops and settled with his tenants. After his second marriage his wife was always present when a settlement was made with the tenants, whether at home or in Danville, and was constantly making suggestions, and in one way or another interfering with the tenants. As a result, most of the tenants who had been with him a number of years left. The son and grandchildren, who had been raised and lived on the place all of their lives, (except two of the granddaughters who married men living elsewhere), moved away.

The old man who, prior to the death of his wife, had been of more or less jovial temperament, became depressed, worried over trifles, and seemed despondent because of his inability to pay his debts. His wife interfered with his business deals, and as one witness said, treated him like a baby.

John T. Walton had purchased, for the benefit of his first wife, a certificate of insurance for $1,000 in the Shriner's Beneficial Fund Association. In March 1932 he caused the name of the beneficiary to be changed to Myrtle I. Walton. He gave his wife a Franklin car, title to which had previously stood in his name. Later he bought a light delivery truck, which he also gave to Myrtle I. Walton. On August 12, 1932, less than two years after his marriage, he gave his wife all of the land owned by him which was free of encumbrances, and on the same day executed a will making her the sole beneficiary, contrary to his previously expressed intention to leave property to his son and grandchildren. On the same day, August 12, 1932, Myrtle I. Walton caused her will to be made by the same scrivener who drew Mr. Walton's will, making her husband the sole beneficiary of her estate. She stated that as soon as Mr. Walton came out of Mr. Scruggs's private office he told her of the will he had made, and she told him that if she died before he did, he wouldn't have any property, and she thought it was nothing but right that she make him her sole beneficiary. It doesn't appear that she had any property to dispose of other than that given her by John T. Walton. Even after this will was made, a colored man living on the

farm said that Mr. Walton showed him some boundary lines of lands that he expected to give to his son and his grandchildren. Finally on July 5, 1934, John T. Walton committed suicide.

Judge Staples in *Young* v. *Barner*, 27 Gratt. (68 Va.) 96, 103, said: "In all questions of testamentary capacity, particularly where the evidence is conflicting, the courts are inclined much to consider the dispositions contained in the will. If such dispositions be in themselves consistent with the situation of the testator, in conformity with his affections and previous declarations—if they be such as might justly have been expected—this is itself said to be persuasive evidence of testamentary capacity. The rationality of the act goes to show the reason of the person. This rule has been repeatedly applied in the English courts in cases of doubtful capacity from age or sickness. 1 Jarman, page 82, note."

In *Hartman* v. *Strickler*, 82 Va. 225, 237, Judge Lewis applied this principle in testing the validity of a will which made an unnatural disposition of testator's property. Speaking to the point he said: "The question as to what is undue influence, such as to overcome the will or control the judgment of a testator, largely depends upon the circumstances of each case, the chief of which are the dispositions contained in the will, the situation of the testator, and his mental and physical condition at the time the will is made. 'And the better opinion seems to be that whenever influence is successfully employed to induce a testator to make a grossly unequal disposition of his property, or disregard the ties of blood without sufficient cause, it should be viewed as illegitimate, and may be treated as undue.' Notes to *Huguerrin* v. *Basely*, 2 Lead. Cas. Eq., Pt. II, page 1265. On the other hand, where the provisions of the will accord with the affections and previous declarations of the testator, and are such as might have been justly expected, that is persuasive evidence both of testamentary capacity and freedom of action. *Young* v. *Barner*, 27 Gratt. [68 Va.] 96."

In *Hartman* v. *Strickler*, *supra*, and *Whitelaw's Ex'r* v. *Sims*, 90 Va. 588, 19 S. E. 113, is found the following language:

"Where a will executed by an old man differs from his previously expressed intentions, and is made in favor of those who stand in relations of confidence or dependence towards him, it raises a violent presumption of fraud and undue influence, which should be overcome by satisfactory testimony." But in *Culpepper* v. *Robie*, 155 Va. 64, 88, 154 S. E. 687, 696, we held that the above statement of the principle is too broad, and that "A more accurate statement would be that these are circumstances from which undue influence may be inferred, but are not alone sufficient to establish fraud, certainly not as between parent and child or husband and wife."

In the case at bar, according to the evidence eliminated, we have all of the circumstances stated above, and the following superadded facts. (1) The testator in addition to being an old man, was mentally and physically weakened by the use of whiskey and drugs. (2) Even after the will was drawn, he showed one of the tenants the intended corner of land he had determined to give one of his own blood. (3) His second wife, the sole beneficiary in his will, insisted on being present when any money was paid him, and when settlements were made with tenants for crops sold. (4) She was the cause of his old tenants and members of his family leaving the farm. (5) Statements made by the husband when he was ill, and at times irrational, to the effect that he hated the estrangements which had arisen between him and his blood relations, and that his wife had taken all of his property "down to his last pig." (6) Statements of the wife that the grandchildren cared nothing for their grandfather. (7) Notice, in the handwriting of the wife, addressed to the son, demanding that the son vacate his father's premises which he had occupied for a number of years. (8) On the day that the will was signed, five other instruments were executed; four deeds of gift from the husband to the wife, conveying to her all of his lands not encumbered, and the will of the wife giving the husband all of the property he had given her, in the event that she died first.

The case made by the evidence for the proponents of the will is entirely different from that presented by the appellants, and if believed by the jury would have sustained a verdict

declaring the will valid. A number of witnesses testified that while John T. Walton was an old man, addicted to some extent to the use of whiskey and drugs, he was a man of positive character, not easily persuaded to do anything he didn't want to do; that during the depression he was hard pressed by his creditors, and worried because of his inability to meet his obligations promptly; that while he was of sound mind and disposing memory he determined to make and did make the will, bearing date August 12, 1932, leaving all of his property to his wife, and at the same time determined to convey to her the land described in the four deeds mentioned, so that if his creditors did institute foreclosure proceedings, both she and he might save something out of the financial ruin which seemed to stare him in the face, and that he determined to do this without being unduly influenced by the wife, and that while he regretted the weakening of family ties, it was due to the actions of the son and grandchildren alone.

Other witnesses introduced by proponents testified that they had various business transactions with the testator, before and after August 12, 1932, both when his wife was present and when she was absent, and that his mind seemed sound; that the business deals were consummated without any help or assistance from the wife; that in these transactions the testator was well able to look after his own interest; and that sometimes his wife made suggestions which he did not follow.

Willie E. Walton, the son, refused to join in the attack made upon the will, and testified that his father talked with him after he had given property to his step-mother. He related other incidents which tended to show that his father was of sound mind, and was not unduly influenced by Myrtle I. Walton in executing the instruments herein questioned. However, his testimony is weakened by the fact that Myrtle I. Walton promised to give him a farm, but said that she couldn't do it then, as all of the land was encumbered by mortgages, and that she had to get the debts paid before she could execute a conveyance. Myrtle I. Walton testified that she did not offer Willie anything definite. "I wasn't offering anything definite. The others would have been treated just as well, but

they seemed to be antagonistic. * * * I wasn't intending to make him any deeds. * * * I told him there was 192 acres; he could have a farm—there was no proposition made about it at all."

Both Willie E. Walton and Myrtle I. Walton testified that these very indefinite arrangements between them were made before this proceeding was instituted, or anything was said about an attack on the will.

In January 1934, a notice in the handwriting of Myrtle I. Walton was given to Willie E. Walton to vacate the premises of his father, upon which he had lived for more than 50 years. He testified that he had made up his mind to move and that he had informed his father prior to the time of the serving of the notice that he expected to move, and that his father was anxious to get possession of the house he occupied for another tenant. This incident of a father, who had previously been devoted to his son, giving legal notice to him to vacate the premises, upon which the son had lived all of his life, is, to say the least, unusual.

While no one of the incidents mentioned by appellants' witnesses was sufficient in itself to establish mental incapacity or undue influence, when all are considered together, undue influence may be inferred therefrom. This being true, the record presents an issue which should be determined by a jury. The trial court erred in sustaining the motion to strike.

*Reversed and remanded.*