## Richmond

FRED C. WALKER AGENCY, INC. AND THE
AETNA CASUALTY & SURETY COMPANY
v. CLARENCE E. LUCAS ET. AL.

January 20, 1975.

Record Nos. 731022 and 731025.

Present, All the Justices.

*Henry H. Whiting; Talmage N. Cooley (Kuykendall, Whiting & Costello; Edmunds, Freed, Cooley & Willetts*, on briefs), for plaintiffs in error.

*Robert Scott Janney (Roby G. Janney; I. Randolph Dovel*, on brief), for defendants in error.

Compton, J., delivered the opinion of the court.

The question for decision in this law action, wherein recovery is sought for an alleged breach of an oral contract to renew a fire insurance policy, is whether the plaintiffs' evidence was incredible and so manifestly false that reasonable men ought not to believe it.

On November 18, 1971, a dwelling owned by the plaintiffs, Clarence E. Lucas and Mildred D. Lucas, located in Shenandoah, Virginia, was damaged by fire. Thereafter, the plaintiffs brought this action in contract against the defendants, Fred C.

Walker Agency, Inc., and The Aetna Casualty & Surety Company, seeking recovery for their losses resulting from the fire, the insurer having denied their claim. The insurer had previously issued a contract of fire insurance covering the dwelling and its contents, as a part of a "Homeowners Policy," its three year term expiring on October 9, 1971. The basis of this action was an oral contract to renew the policy, allegedly made in a telephone conversation on October 6, 1971, between Mrs. Lucas and Deldee Emerson, an employee of the Agency and a licensed agent for the insurer, who was authorized to effect oral contracts of fire insurance.

The defendants appeal from the August 6, 1973, order of the trial court wherein a joint judgment was entered on the jury verdict of $11,390 against the defendants. In his letter opinion overruling the defendants' motion to set aside the verdict, the trial judge stated, *inter alia*, ". . . that the issue of whether or not an agreement was made by the Walker Agency to renew the plaintiff's fire insurance policy with Aetna was a factual finding for the jury's determination." He further wrote that " [w]hile I was not personally persuaded by Mrs. Lucas's testimony, neither can I hold her story completely incredible." We affirm.

The writ of error was limited to the consideration of the foregoing question dealing with the sufficiency of the plaintiffs' evidence.[1] The plaintiffs' burden was to prove the contract by clear and convincing evidence. *Haskins* v. *Agricultural Fire Insurance Company*, 78 Va. 700, 707 (1884); Couch on Insurance 2d § 14:21.

Precedent dictates that the evidence and all reasonable inferences therefrom be viewed in the light most favorable to the plaintiffs, since they come before us fortified by a jury's verdict which has been approved by the trial court.

This controversy centers around the policy of fire insurance in question and a policy of automobile insurance, both issued by the defendant insurer. In the main, the plaintiffs' oral testimony was pitted against the defendants' documentary evidence.

Mildred Lucas resided in the dwelling in question with her four minor children. Clarence Lucas, her husband, lived in the "Soldier's Home" in Washington, D. C.

---

[1] The question of misjoinder of the parties defendant is not before us.

On April 5, 1971, Mrs. Lucas obtained through the Agency, which had its principal office in Luray, Virginia, renewal of a "Family Automobile Policy" covering a Pontiac automobile, wherein she was the named insured. The face of the renewal policy showed the premium to be due in installments of $48.40, $36.30 and $36.30 on April 5, July 5, and October 5, 1971, respectively. Mrs. Lucas testified that she paid the first installment of $48.40 "towards the last of March" 1971, in cash. The records of the Agency failed to show receipt of this payment, and in June the Agency sent Mrs. Lucas a bill showing that the first and second installments were due as of April 15 and July 15 respectively. In July of 1971, the Pontiac became inoperative and Mrs. Lucas admitted that the July installment was not paid when due.

The Agency, in a letter dated September 24, 1971, notified Mrs. Lucas that " [w]e will be unable to renew your homeowners policy, which expires October 9, 1971 due to the past due account. It must be paid in full." She did not recall receiving this letter but testified that on October 6, upon receipt on that day of a second, similar letter from the Agency, she called from her home and spoke by telephone with Mrs. Emerson "with reference to the insurance policies." Mrs. Lucas testified:

> "Well I called and told her that I had been sick and I was unable to send the full amount, but if I sent $48.40 to let the $33.00 which was the fire insurance on the home renew my policy on my fire insurance on my home, with the remaining to go over on my car insurance and which I would catch up later. If that was agreeable. And she said that would be fine. I said otherwise I'll just cancel the car insurance. She's says no, if you can arrange it like that, that'll be just fine. And I repeated several times that I was concerned about the fire insurance on my home, not the car, because it was in the garage and had been there since July." [2]

Mrs. Lucas' daughter, 17 years of age, who was in the same room with her mother during the telephone conversation, testified concerning her mother's statements as follows:

---

[2] The premium on the expiring Homeowners Policy had been $33.00 annually. Mrs. Lucas stated that, in the past, she had always dealt with the defendants through Mrs. Emerson.

"Well I remember her saying that she didn't - she wasn't concerned about the car insurance, because the car had been in the garage. And that she was not concerned about that, what she was concerned about was her fire insurance and she wanted to make sure she, you know, had all that straight. And I couldn't say what Mrs. Emerson said, but it had to do with so much money that mama had to send. And so that's what - talked on the phone."

On that day and shortly after the telephone conversation, and because her mother "had been sick," the daughter purchased and mailed a postal money order in the amount of $48.40 payable to the Agency, with funds Mrs. Lucas had given her. Mrs. Lucas testified that of this amount, $33.00 was the premium for renewal of the fire policy and $15.40 was to be applied to the automobile insurance premium, all in accordance with her oral agreement with the agent.

The Agency received the sum the following day and considered the full amount to be payment of the balance it claimed to be then due on the first installment of the automobile insurance premium, and credited it accordingly.

The expiration date of the 1968 fire policy, as stated, was October 9, 1971. By virtue of the foregoing payment and the agreement with the agent, the plaintiffs claim the policy was renewed. The defendants claim the fire policy expired on that date and that it was not renewed. Mrs. Lucas never received written confirmation that her fire policy had been renewed.

The next communication among the parties occurred the day before the fire when the Agency received another money order from Mrs. Lucas in the amount of $36.30, sent by her as a third payment on her automobile insurance ($48.40, $15.40, and $36.30), but credited by the Agency as payment of the second installment thereon, according to the payment schedule shown on the face of the policy.

On November 18, Mrs. Lucas was notified of the fire while at work at "Luray Textile" about 9:00 p.m. On November 19 about 9:45 a.m., she notified Mrs. Emerson by telephone of the fire. Mrs. Lucas related the conversation as follows:

"I told her that my house had burnt. She says, oh good. And I said I beg your pardon. She said I said oh good. And I said well what's good about it. She said well Mr. Walker or she

mentioned another gentleman there at the office wasn't in but as soon as they came in they would send one of them up to my house."

Mrs. Emerson testified that she received the call and admitted that she told Mrs. Lucas she was "sending someone up there."

Because no representative of the Agency came to the scene of the fire, Mrs. Lucas, at about noon on that day, went to the Agency office in Luray seeking Mrs. Emerson or Fred C. Walker, the Agency's chief executive officer.

Neither Walker nor Mrs. Emerson was available in the office when Mrs. Lucas first arrived. While waiting to see them, she inquired of Barbara Ramey, another Agency employee, as to the balance due on her automobile insurance. When told that $36.30 was then due, Mrs. Lucas then paid that sum in cash. She explained this voluntary overpayment of her automobile insurance premium in the amount of $15.40, by testifying that she was upset having just "lost everything I had worked for" in the fire and when "the lady said $36.30 . . . I paid it," without realizing it resulted in an overpayment. The Agency considered this to be the third installment payment on the automobile policy. At the same time, pursuant to Mrs. Lucas' request, the automobile insurance coverage was transferred from the Pontiac to a Ford automobile, another inoperative motor vehicle which she owned but which was being repaired.

Mrs. Lucas finally saw Walker after lunch on November 19, and he advised that her fire insurance ". . . was not in force, had not been renewed and that she therefore did not have any coverage." Mrs. Lucas did not see Mrs. Emerson at the office on November 19.

Four or five days later, Mrs. Lucas went to Mrs. Emerson's home, accompanied by her daughter and James Sly, a friend of the daughter, to discuss the fire insurance problem and the conversation of October 6. Mrs. Lucas testified that Mrs. Emerson then told her that she had forgotten to send the ". . . renewal policy on my home . . ." and that, while she remembered the telephone conversation in question, she could not recall it verbatim. Sly corroborated this testimony of Mrs. Lucas.

The evidence of the defendants contradicted that of the plaintiffs in almost every particular. For example, Mrs. Emerson denied that a telephone conversation with Mrs. Lucas

took place on October 6, but testified concerning a September 29 telephone conversation wherein she agreed to reschedule, at Mrs. Lucas' request, the delinquent automobile insurance premium payments. According to Mrs. Emerson, a payment of $48.40 was to be made by money order on October 4, followed by two payments of $36.30 each, due October 18 and November 1, respectively. She denied any discussion concerning the fire insurance. An office memorandum corroborating this testimony, which Mrs. Emerson stated was made contemporaneously with the conversation, was received in evidence.

In addition, the defendants introduced the attendance record from Mrs. Lucas' employer tending to show that she was at work on October 6 when she claimed to be at home. Also, the Agency accounting records failed to show a March cash payment and, instead, showed that the October and November payments were credited to the automobile policy and not the fire policy.

The defendants argue that, as a matter of law, the testimony offered by the plaintiffs is "demonstrably false" and her "alleged conduct is so contrary to human experience," that the plaintiffs have failed to prove their case by clear and convincing evidence. They further argue that because the defendants' documentary evidence "so clearly preponderates" over the plaintiffs' oral testimony and is in direct conflict therewith, the plaintiffs' evidence is therefore incredible and no issue of fact has been presented.

To support these views, the defendants point out, for example, that the March cash payment was made before it was due, and note that the Agency records "clearly showed" that no receipt had been issued to Mrs. Lucas at that time. They argue that it is contrary to human experience for a debtor to pay the exact amount of a single new debt of $33.00 and to apply only a small part ($15.40) of such payment to "an older and larger debt." They contend that it is contrary to belief to suppose that the annual renewal premium in 1971 for the fire policy would be the same ($33.00) as it was in 1968. They argue that it is incredible to conclude that Mrs. Lucas' payments were "anything other than the automobile insurance payments." We are not persuaded.

Clear and convincing evidence has been defined as "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations

sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal.*" *Cross* v. *Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118, 123 (1954). We are unable to say that the plaintiffs' evidence fails to produce in the mind of a reasonable man a firm belief as to the facts sought to be established, even considering the effect of the contrary documentary evidence offered by the defendants. The plaintiffs argue, with considerable logic, that " [t]he bookkeeping records, i.e., the account cards, billing statements, and receipts simply indicate how defendant Walker's bookkeeper treated the transactions and not how the payments or the homeowners policy were supposed to have been treated."

The plaintiffs' evidence, while not completely plausible, is not manifestly false nor is it incredible. After all, the positive oral testimony of Mrs. Lucas is supported in material parts by testimony of her daughter and the daughter's friend. Moreover, Mrs. Emerson corroborates Mrs. Lucas' testimony to some extent. For example, she admits telling Mrs. Lucas that she would send "someone up" to the scene of the fire after being notified of it. Mrs. Emerson never elaborated upon that testimony, or was she asked to explain its meaning. The logical inference is that she believed that fire coverage was in force as the result of the agreement of October 6, and that an adjuster would be dispatched to the scene.

"In testing the credibility and weight to be ascribed to the evidence, we must give trial courts and juries the wide discretion to which a living record, as distinguished from a printed record, logically entitles them. The living record contains many guideposts to the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them." *Bradley* v. *Commonwealth,* 196 Va. 1126, 1136, 86 S.E.2d 828, 834 (1955). Here, we have positive, corroborated oral testimony contradicted by other oral testimony and documentary evidence. Under these circumstances, and applying the rule of *Bradley,* we hold that the issue is one of fact rather than one of law. Accordingly, we affirm the judgment of the trial court.

*Affirmed.*

*Cochran, J., dissenting.*

I disagree. After giving the plaintiffs the benefit of all reasonable inferences to which they are entitled, as parties fortified by a jury verdict approved by the trial court, I nevertheless find their evidence unbelievable. The trial judge stated that he was "not personally persuaded by Mrs. Lucas' testimony" but that he could not hold her testimony to be "completely incredible". I have no such difficulty. In the face of the record before us, in which the documentary evidence of the Walker Agency is clear, unequivocal, and conclusive, and the testimony of Mrs. Lucas, her teen-age daughter and the daughter's teen-age boyfriend is completely incredible, it is apparent that the jury returned a verdict based on sympathy and compassion.

I deem it to be our duty to correct such an error, and I would reverse the judgment of the trial court and enter final judgment for the appellants.

*Harrison and Poff, J.J., join in this dissent.*