# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

EDWARD K. ENGLISH

v.

PAUL A. ANGEL

August 28, 1980.

Record No. 781106.

Present: All the Justices.

*William L. Stauffer, Jr. (Harvey B. Cohen; Leonard, Cohen, Gettings and Sher, on brief), for appellant.*

*Samuel M. Walker, Jr. (David A. Powers, III; Grubbs, Ennis, Powers and Walker, on brief), for appellee.*

HARRISON, J., delivered the opinion of the Court.

Edward K. English filed his motion for judgment in the court below, claiming that he had been damaged in the amount of $21,119.66 as the result of fraud and deceit perpetrated by Paul A. Angel in connection with a sale of a retail business. The defendant filed a counterclaim for damages in the amount of $20,000 by reason of the alleged detention by plaintiff of certain personal property belonging to Angel. Upon trial and at the conclusion of all the evidence, the court granted plaintiff's motion to strike defendant's evidence and defendant's motion to strike plaintiff's evidence, and entered an order discharging the jury.[1] The plaintiff appealed.

---

[1] The final order also contained the following paragraph: "IT APPEARING TO THE COURT that the 'old' Capitol Marine, Inc. dealer reserve account in the Bank of Virginia was not conveyed to the plaintiff as part of the Memorandum of Agreement of Sale dated April 27, 1976, it was by the Court ORDERED that ownership of the 'old' Capitol Marine, Inc. dealer reserve account in the Bank of Virginia remained with the defendant, . . ."

Paul A. Angel owned all the capital stock of Capitol Marine, Inc., a company which conducted a retail sporting goods business in Williamsburg with emphasis on selling and servicing boats and outboard motors. During the spring of 1976 English and Angel began discussing the possibility of English purchasing the business. Angel exhibited to English a financial statement reflecting the condition of the corporation as of September 30, 1975. Among other assets listed, the statement showed that on September 30, 1975, the corporation had $19,812.43 cash on hand and in banks, $14,429.18 in trade accounts receivable ($18,443.77 less allowance for doubtful accounts of $4,014.59), $5,976.92 in dealer's reserve fund, and $11,882.27 in notes receivable. A note attached to the statement explaining the dealer's reserve read: "The Company is contingently liable on notes receivable discounted at the Bank of Virginia in the amount of $100,823.79 as of September 30, 1974. The contingent liability at September 30, 1975 has not been provided."

Following several weeks of negotiations the transaction was consummated when the parties entered into a memorandum of agreement, dated April 27, 1976. By its terms Angel agreed that the corporation would sell to English all its assets, including good will and the corporate name, for $65,000, but with the express reservation and understanding that Angel was excepting from the sale and reserving to himself (1) a 1974 Ford automobile, (2) all the cash in the bank account of the corporation except $2,500, and (3) a debt which Angel owed the corporation in the approximate amount of $12,000. English agreed to "take all necessary steps to remove Angel as an individual guarantor of [the] Corporation's obligations as to the floor-plan financing with the Bank of Virginia," and further agreed that he and the new corporation, which he was to form, would assume all liability therefor. Angel assumed responsibility for all debts of the corporation incurred prior to May 1, 1976, with the exception of the floor-plan financing obligation which the corporation had with the Bank of Virginia. Angel also leased to English the buildings and land on which the business was then being conducted and granted plaintiff an option to purchase the property for $143,000.

Thomas Keith Verzi represented English in the various negotiations looking to a purchase by his client of the assets of Capitol Marine. During the course of negotiations a number of written offers were submitted by English. On March 23, 1976, plaintiff offered Angel $45,000 for the capital stock of the corporation. The offer was rejected because it did not provide sufficient security for Angel's

protection. On April 13, 1976, English made an offer of $45,000 for the stock and agreed to give Angel a lien on certain property owned by English to secure the payment of the purchase price. This offer was rejected as inadequate.

Thereafter English and Verzi had additional discussions with Angel to determine what they could do "to make the business deal work out." Verzi said that Angel told them that he could not "go through with the deal at $45,000 because that was not enough money in light of the fact that he had so much in accounts receivable." English and Verzi testified that plaintiff's offer was then increased to $55,000 which Angel declined to accept because of the amount of his "accounts receivable." Verzi testified that at this stage of their negotiations he said to Angel, " 'Well if you won't accept that, what are your accounts receivable exactly?' because we had bantered around that they were a lot and over twenty, so I said, 'What are they exactly?' " Responding to that question, Verzi testified that Angel obtained an account book from his desk, opened it up and pulled out a tape which he said reflected accounts receivable due the corporation in the amount of $23,694.44. Both plaintiff and his attorney testified that Angel represented the amount shown on the tape to be the total of accounts receivable and that he further stated that "[i]t's approximately two weeks old, but it's pretty much up to date. There are some new things that haven't been entered."

Additionally Verzi testified that, to justify his request for a higher price for his stock, Angel also represented to them that the sum of $1,624.70 was due the corporation for work performed by it for customers during several days immediately prior to the time of their conference. Plaintiff and Verzi testified unequivocally that following the representation made by Angel of the amount of the corporation's accounts receivable, and the amount due on work orders, and relying thereon, English increased his offer for the assets of the corporation to $65,000. Verzi was emphatic in his testimony that Angel, in representing the company's accounts receivable to be $23,694.44, indicated that if there was any change in this total it "would be up" since his tabulation was about two weeks old and therefore "the last fourteen days accounts receivable would not necessarily be in the tape." Verzi said that the amount of work orders due the corporation was considered in an effort to "try to get it [accounts receivable] even more current."

English took over the business on May 1, 1976, and said that he understood that monthly bills had been sent out by Angel. After

ten days without any response he asked Angel which bills had been mailed, and inquired generally about the status of the accounts receivable. He said that he requested defendant to go over the accounts with him and that when he did so Angel "indicated that this person don't owe that money and that person don't owe that money and that one shouldn't be there and things of this nature." English said it developed that in excess of $10,000 of the accounts receivable were nonexistent and that Angel said they "shouldn't be there." Plaintiff said that the only explanation that Angel gave for the disparity between the $23,694.44 shown by the tape and the actual accounts receivable was that Angel did not have as good a bookkeeper as English. English alleged and testified that it developed that only accounts receivable aggregating $9,780.94 actually existed and were valid and outstanding. English explained in his testimony that this discrepancy was vital to him because he was undercapitalized and was looking to the amounts that should have been collected on the accounts receivable as the quickest source from which to obtain working capital for the business.

Angel's version of the transaction was that he considered it as a package deal and made no effort to break down the difference in price between the stock and the land. He denied that he specifically represented to the plaintiff and his attorney that the accounts receivable of the corporation aggregated $23,694.44. He said that he had experienced difficulty in employing secretaries, that his books "had not been brought up for sometime," and that he told English that "I thought there was $23,000 and some dollars on the books. Some of them were six, seven, [or] eight years old." He said that he told English and Verzi that he figured that English could possibly collect $10,000 or $12,000 out of the entire amount. He admitted that some of the accounts in his book were too old to collect and that although some of his debtors had taken bankruptcy their accounts had never been removed from the book. He said that he explained "all of this" to the plaintiff and his counsel, and that at no time did he ever represent the exact amount of the accounts receivable, or make any representations as to the amount that the plaintiff could expect to collect on the accounts.

Clearly, the testimony given by plaintiff and his attorney is in conflict with the testimony given by defendant. Plaintiff's testimony is that at a crucial point in their negotiations, and at the time when the only unresolved issue between the seller and the buyer concerned the value of the assets being sold and the amount the buyer should

pay, the defendant made a false and misleading representation of a material fact with the intent that it influenced the buyer, and that it did mislead English. The fact allegedly misrepresented was that included in the assets of Capitol Marine, Inc.,. were accounts receivable aggregating $23,694.44 when in truth the accounts receivable totaled less than $10,000.

■ Capitol Marine, Inc., was a very small business operation with average retail sales of approximately $31,100 a month during the twelve months immediately preceding the sale. Plaintiff says that the defendant, as the sole owner, operator, and manager of the business, was necessarily familiar with his customers, their financial condition, and the status of the accounts with the corporation. Plaintiff alleged, and introduced evidence in support of the allegation, that defendant either deliberately, knowingly, and falsely misrepresented the amount of the accounts receivable, or that defendant made the representation wantonly, recklessly, and carelessly without regard for the truth or accuracy thereof. In either event, if a jury concludes that plaintiff has established his allegations by clear and convincing evidence, and that he was damaged thereby, plaintiff is entitled to recover.

■ In the case under review the court struck plaintiff's evidence after the introduction of all the evidence. Under such circumstances we held in *Matney* v. *Cedar Land Farms,* 216 Va. 932, 933-34, 224 S.E.2d 162, 163 (1976), as follows:

> On review of a case in which the trial court has sustained a motion to strike after the introduction of all the evidence, we apply the principles governing consideration of evidence upon a motion to set aside a verdict as contrary to the evidence. *See Burks Pleading and Practice* § 284 at 514 (4th ed. 1952). "[W]e examine the evidence to determine whether or not a verdict in behalf of the losing party can be sustained. That is, upon a careful consideration of all the evidence, if we are of opinion that reasonable men may differ on the conclusion to be reached, then it is our duty to hold that the trial court committed error in striking the evidence." *Walton* v. *Walton,* 168 Va. 418, 422, 191 S.E. 768, 770 (1937). In viewing the evidence we give the plaintiffs "the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom." [Citations omitted.]

We have carefully reviewed the evidence in this case, and we are

unable to conclude that reasonable men and women may not differ on the conclusion to be reached. Giving the plaintiff the benefit of all substantial conflict in the evidence and all fair inferences that may be drawn therefrom, as we must, we conclude that the court erred in striking plaintiff's evidence and withdrawing the case from the jury insofar as it involves the accounts receivable.

Notwithstanding that the court struck the evidence of both plaintiff and defendant, it included a paragraph in its final order to the effect that the ownership of Capitol Marine's dealer's reserve account in the Bank of Virginia remain with the defendant. This account was reflected on the company's financial statement as an "other asset." The reserve had been accumulated in the bank as a result of the discount there by Capitol Marine of its customers' notes. When the company sold a boat and took the customer's note, and subsequently discounted the note at the bank, a portion of the difference between the interest charged the customer by Capitol Marine and the interest it paid the bank was placed in a "nondrawable account" designated "dealer's reserve." The amount in this account was held by the bank to cover any losses it might sustain by reason of repossessions or nonpayment of customers' notes. The amount in the dealer's reserve account was $7,200 at the time English took over the business. Apparently the account is still intact because some of the notes discounted by the defendant, prior to his sale of Capitol Marine to plaintiff, have not yet matured.

Entitlement to this reserve fund is also in controversy between the parties hereto. The contract prepared by defendant's attorney states that *all* the assets of Capitol Marine were being sold, with the three exceptions noted. The defendant testified that the dealer's reserve was not a checking account. The defendant assumed payment of all debts and obligations of the corporation incurred prior to May 1, 1976. This assumption includes the contingent liability of Angel and Capitol Marine on notes of customers which Angel had discounted at the Bank of Virginia and which totaled $100,823.79 on September 30, 1974. The plaintiff claims that he purchased this dealer's reserve along with other assets of the corporation and will be entitled to receive payment of it upon discharge of the obligations of Capitol Marine at the Bank of Virginia on which Angel is contingently liable. Angel says that this reserve fund was not included in his sale of the assets of Capitol Marine to plaintiff, and that upon the discharge of the various obligations on which he is contingently liable the dealer's reserve fund should be released to him. Admittedly, when

the discounted notes are paid, the bank will release the dealer's reserve fund to the party who is determined to be entitled thereto.

It appears from the testimony that the status of the dealer's reserve was not mentioned during the negotiations between the buyer and the seller. Both English's attorney and the attorney who represented Angel in drafting the contract testified that the dealer's reserve was not discussed prior to the contract's execution. Defendant's accountant testified that the reserve account was never discussed in his presence until some weeks or months after the sale had been consummated when it came to his attention that both English and Angel were trying to withdraw the reserve.

We hold that the entitlement to the balance, if any, that will remain in the dealer's reserve account involves a construction of the April 27, 1976 contract between plaintiff and defendant and is not a matter properly before the court in the action brought by the plaintiff for fraud and misrepresentation. We therefore conclude that the trial court erred in striking the plaintiff's evidence on the issue of fraud and misrepresentation by the defendant of the amount of the accounts receivable of Capitol Marine, Inc., and that the case should be remanded for a new trial on that claim only, the judgment on the counterclaim being unappealed and now final. The action of the trial court in deciding the ownership of the dealer's reserve is also reversed upon the ground that this was not an issue properly cognizable by the court in this action.

*Reversed and remanded.*