## Malcolm B. Higgins, II, Executor, etc.

### v.

## Jacqueline L. Bowdoin

Record No. 880082

June 9, 1989

Present: All the Justices

*Jack E. Ferrebee (Stallings & Richardson*, on brief), for appellant.
*William L. Perkins, III (Price, Perkins & Larkin*, on brief), for appellee.

Justice Thomas delivered the opinion of the Court.

In this appeal, Malcolm B. Higgins, II, Executor of the Estate of Gladys L. Steel (Higgins), claims, on behalf of the estate, money which his decedent had placed in a joint money market account with Jacqueline L. Bowdoin (Bowdoin), an individual who was not related to the decedent. The account card identified the account as a survivorship account. Higgins demanded the money from the bank which refused to pay it to him. Instead, the bank paid the money to Bowdoin. Higgins sued, seeking a return of the money. The matter was tried to a jury. However, the trial court struck Higgins' evidence at the close of plaintiff's case. Higgins appeals.

Because the trial court sustained a motion to strike at the conclusion of plaintiff's case, upon familiar principles, we will set forth the facts and all reasonable inferences arising therefrom in the light most favorable to Higgins. Gladys L. Steel (Steel), died testate on October 4, 1986. A will dated April 10, 1980, and a codicil to that will dated April 23, 1980, were admitted to probate. In the will, Steel made four specific bequests. One was to Bowdoin and her husband. Steel bequeathed to them her "1971 Volkswagen, or such personal automobile" as she might own at the time of her death. In the will's residuary clause, Steel left the remainder of her property to six of her relatives.

In the codicil, Steel made ten additional specific bequests. Again, one bequest was to Bowdoin and her husband, consisting of a marble top table, all dolls and doll furniture, all afghans, and all crystal and glassware. Other than the specific bequests listed in the codicil, Steel re-affirmed her will.

On April 12, 1985, Steel, accompanied by Bowdoin, went to First American Bank in Virginia Beach to close a savings account and to open a money market account. Rebecca B. Chandler was the bank employee who opened the money market account for Steel. Chandler discussed with Steel whether the account should be interest bearing or a regular account. She also recommended that the account be opened as a joint account so that if the deposi-

tor became sick or incompetent "someone could at least pay their bills for them." When Steel heard Chandler's advice, she was unsure and confused about what to do. Several times, Steel sought Chandler's advice regarding the names in which the account should be opened. Chandler said she could not tell Steel what to do.

Steel then conversed with Bowdoin about the matter. During that conversation, which Chandler overheard, Steel "mentioned that she didn't have anyone locally that she could — any family locally that she could add their name onto the account." Asked what happened after Steel conferred with Bowdoin, Chandler said "[w]ell, at that time I went ahead and started typing the signature card, and she said she would go ahead and put Mrs. Bowdoin's name on there."

Chandler did not recall that Steel had told her to create a survivorship account. When she was asked why she typed an "x" in the box signifying survivorship, Chandler said that almost every account was opened that way. She explained further, however, that joint accounts with survivorship were usually opened with two family members listed on the account. Chandler was unsure whether Steel understood that she was opening a survivorship account. All of the money in the account came from Steel.

Cary P. Quincy, Jr., who was Steel's neighbor for twenty-five years, contacted Higgins on his own when he learned of the disposition of the funds from the money market account because Quincy "knew that it was not the way that [Steel] wanted it." Quincy testified that he talked to Steel about the money market account in April 1985, shortly after Steel had opened the account. Quincy had long urged Steel to execute a power of attorney so that someone could manage her affairs if need be. In April 1985, the issue was fresh in Quincy's mind because he had just placed one of his uncles in a nursing home and had become responsible for taking care of his uncle's business affairs.

Quincy again asked Steel whether she had executed a power of attorney. She told him she had not but that "she had made up a checking account with Jackie [Bowdoin] which authorized her to write checks" on the account in the event that Steel became incapacitated. Upon learning what Steel had done, Quincy told her that if she had opened a joint account with Bowdoin, at Steel's death all the money in the account would belong to Bowdoin. Steel became "greatly disturbed" and replied, "[t]hat's not the

way that I wanted it and that's not the way that I understood it." She was so disturbed by Quincy's statements that, had the bank been open, he would have taken her there immediately. Quincy asked Steel whether she was going to do something about it, she said "I sure do hope that you're wrong about that." Steel added, "I will take care of it. I'll talk to Jackie [Bowdoin] about it."

Bowdoin was also of the understanding that the joint account did not have a survivorship feature. Higgins spoke to Bowdoin and her husband about the account shortly after he learned of its existence. Higgins talked to Bowdoin by telephone on October 11, 1986, seven days after Steel's death and two days after he received a bank statement regarding the money market account. Bowdoin told Higgins that, though she was aware it was a joint account, it was not a survivorship account.

Thereafter, on October 17, 1986, Higgins met Bowdoin and her husband at the local Division of Motor Vehicles' office to transfer title of the Volkswagen to them pursuant to Steel's will. At that time, he again asked Bowdoin about the account. Bowdoin reiterated that the account was a joint account. Bowdoin explained that she had been there on the day the account was opened and that it had been opened for the purpose of providing access to Steel's funds by Bowdoin in the event Steel became ill or was hospitalized as had occurred in 1982. Bowdoin further advised Higgins that, at the time the account was opened, she did not understand that it was a survivorship account.

The evidence also established that Steel had a close loving relationship with the individuals named in the residuary clause in her will. Further, it showed that the money market account was worth in excess of $106,000 and that, excluding the money market account, Steel's estate was valued at $170,000 to be divided among her six relatives.

The trial court struck Higgins' evidence because it was of opinion that Higgins was required to prove by clear and convincing evidence that at the time the account was opened Steel had a different intent than to create a survivorship account. Further, the trial court concluded "that the jury could not from that evidence find that the plaintiff [had] established by clear and convincing evidence that there was some intention different from that presumed by statute, that is, that the [survivor] would receive the funds."

Higgins advances four assignments of error which we paraphrase as follows:

1. That the trial court erred in imposing upon the plaintiff the burden of proving his case by clear and convincing evidence;
2. that the trial court erred in ruling that a joint account need not express survivorship in order for a joint owner to take by survivorship;
3. that the trial court erred in ruling that the evidence, viewed in the light most favorable to the plaintiff, was insufficient to present a jury question regarding decedent's intent at the time the joint account was opened; and
4. that the trial court erred in excluding from the evidence the will of decedent's husband.

We will consider the issues in the order set forth above. In order to resolve the first two issues, we must decide whether the case should have been tried according to common-law principles, as Higgins urges, or whether the provisions of Code §§ 6.1-125.1 through 6.1-125.16 were properly applied.

Under the common-law, the burden was on the party claiming survivorship rights in a joint account to establish entitlement to the money for reasons other than whether the account card was marked survivorship. *Quesenberry* v. *Funk*, 203 Va. 619, 622, 125 S.E.2d 869, 872 (1962). Further, under the common law, where a person made a deposit in his or her own name and the name of someone other than their spouse, there existed a presumption that the account was opened for the purposes of convenience only. *Stevens* v. *Sparks, Executrix*, 205 Va. 128, 134, 135 S.E.2d 140, 145 (1964). Thus, had common-law principles applied to the present case, it would have been presumed that the account was opened for Steel's convenience and Bowdoin would have been required to prove that when Steel opened the account, Steel intended to create survivorship rights in favor of Bowdoin.

Bowdoin submits that Code § 6.1-125.5 reverses the common-law presumption by creating a new presumption that any joint account is a survivorship account unless the depositor plainly designates that the account excludes survivorship. The statutory provisions relied on by Bowdoin went into effect July 1, 1980. The

account here under review was opened in April 1985. Thus, Bowdoin argues, the account was fully subject to the statutory requirements.

Higgins argues that Bowdoin is not entitled to the benefit of the statutory presumption because the account card used to establish the joint account here in dispute did not meet the requirements of Code § 6.1-125.15. According to Higgins, because the statutory provisions relied on by Bowdoin are in derogation of the common law, they must be strictly construed and cannot be enlarged in their operation beyond their express terms. *Hyman* v. *Glover*, 232 Va. 140, 143, 348 S.E.2d 269, 271 (1986). Higgins submits that the common-law rules should have been applied.

We disagree with Higgins. The statutory provisions convince us that the General Assembly intended to change the common-law presumption without regard to the type of account cards used by the bank. Code § 6.1-125.1(4) provides that a joint account need not mention survivorship. Code § 6.1-125.5(A) provides generally that sums on deposit to a joint account belong to the survivor. Code § 6.1-125.5(E) makes reference to two ways to create a survivorship account: the express terms of the account or through the operation of the statute. Code § 6.1-125.16 provides that the statutory provisions apply to all accounts in existence on the effective date of the statute regardless of when the accounts were opened. If the account cards were crucial, the statute would not have applied to accounts opened before the statute's effective date because those accounts could not have used the statutorily required account cards. Moreover, if the account cards were crucial, the statute would have limited the creation of survivorship accounts to the terms of the accounts. For these reasons, we are of opinion that the common-law rule has been supplanted by the statute. Therefore, we hold that the trial court did not err in requiring Higgins to comply with Code § 6.1-125.5(A) and prove by "clear and convincing" evidence that Steel had "a different intention at the time" she opened the disputed account. We hold further that the trial court correctly concluded that a joint account does not have to mention survivorship in order for survivorship rights to exist.

We turn now to the question whether Higgins' evidence was sufficient to survive a motion to strike at the end of plaintiff's case. In ruling on the motion to strike, the trial court commented as follows: that the fact Bowdoin did not understand that the account

was one with survivorship "does not create any basis for determining that Mrs. Steel was unaware that there was survivorship"; that when Quincy told Steel that the money in the account would go to Bowdoin, Steel did not say that "that is not what [she] wanted" nor that she was going to change it; and that while Higgins and Chandler's testimony had some bearing on Steel's intention, that testimony was overcome by certain things testified to by Chandler who opened the joint account. Finally, the trial court concluded "that the jury could not from that evidence find that the plaintiff has established by clear and convincing evidence that there was some intention different from that presumed by statute, that is, that the [survivor] would receive the funds." We disagree with the trial court.

It is a drastic measure to strike the evidence at the end of a plaintiff's case. *Walton* v. *Walton*, 168 Va. 418, 421-22, 191 S.E. 768, 770 (1937). The costs to the administration of justice are high when a plaintiff's evidence is struck because, if the trial court's decision is reversed, the matter must be re-tried in its entirety. *Williams* v. *Vaughan*, 214 Va. 307, 199 S.E.2d 515 (1973). Because of these concerns, we have said that a motion to strike at the end of plaintiff's case should not be granted unless it is conclusively apparent that plaintiff has not proven any cause of action against the defendant. *Id.* at 309, 199 S.E.2d at 517. We have said further that in ruling on such a motion, any doubt about the sufficiency of the evidence "should be resolved against the party making the motion, and the issue submitted to the jury." *Walton*, 168 Va. at 423, 191 S.E. at 770. We have also stated that, "[t]he credibility of witnesses and the weight to be given their testimony are matters peculiarly within the province of the jury. In ruling on a motion to strike, *trial courts should not undertake to determine the truth or falsity of testimony or to measure its weight.*" *Williams*, 214 Va. at 310, 199 S.E.2d at 517-18 (emphasis added).

In our opinion, the trial court did not adhere to the foregoing principles. The evidence was not considered in the light most favorable to the plaintiff. Nor were doubts about the sufficiency of the plaintiff's case resolved against the defendant. Moreover, it appears that the trial court undertook to determine the truth or falsity of the testimony and to weigh the evidence.

Contrary to the trial court's view of the evidence, we think a jury could have found it significant that Bowdoin understood that the account did not give her survivorship rights. Bowdoin was pre-

sent when the account was opened. She heard what Steel heard. If Bowdoin came away thinking that she did not have survivorship rights, a jury could have concluded that Steel came away with the same understanding. Moreover, a jury could have found it significant that Bowdoin said the account was opened by Steel for Steel's convenience in the event Steel became sick or was hospitalized as occurred in 1982.

In addition, a jury could have relied on Quincy's testimony. Quincy stated that when he told Steel that Bowdoin would get the money on Steel's death, Steel said that was not what she wanted and not what she understood. Steel said she would talk to Bowdoin about it. A jury could have concluded that if Steel asked Bowdoin whether the account was with survivorship, Bowdoin — who believed that it was *not* a survivorship account — would have alleviated Steel's fears by saying "no," thus, causing Steel to abandon any further steps to ensure that the account complied with Steel's intentions.

Further, a jury could also have found it significant that Bowdoin and her husband were already provided for twice by Steel: in her will and in her codicil; that Steel had a close relationship with her relatives who were her residuary beneficiaries; that Bowdoin would wind up with the lion's share of Steel's assets, while each of Steel's own relatives would take, at most, one-sixth of $170,000. In short, there was ample evidence to raise a jury question regarding Steel's intent.

 Bowdoin argues, in effect, that even though it may not have been proper to strike the plaintiff's evidence had the plaintiff's burden of proof been by a preponderance of the evidence, it was proper to strike the evidence in this case because the burden of proof was by clear and convincing evidence. We disagree. The fact that a plaintiff must prove his case by clear and convincing evidence does not mean that the case cannot be hotly contested or factually close. It is for the trier of fact, upon proper instructions, to decide whether the clear and convincing burden of proof is met, that is, whether the evidence presented produces in the trier-of-fact's mind "a firm belief or conviction as to the allegations sought to be established." *Walker Agcy. & Aetna Cas. Co.* v. *Lucas*, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975).

*Lucas* itself was a case in which the evidence was in sharp conflict. The plaintiffs had the burden of proving by clear and convincing evidence the existence of an oral contract to provide insur-

ance. The plaintiffs' evidence was completely oral; the defendants' evidence was both oral and documentary. We noted that even though plaintiffs' evidence was "not completely plausible" it was "not manifestly false nor" incredible. *Id.* at 541, 211 S.E.2d at 92. Despite the apparent closeness of the evidence and despite the clear and convincing burden which confronted the plaintiffs, we wrote as follows: "We are unable to say that the plaintiffs' evidence fails to produce in the mind of a reasonable man a firm belief as to the facts sought to be established, even considering the effect of the contrary documentary evidence offered by the defendants:" *Id.*

By the same token, in this appeal we cannot say that reasonable persons could not form a firm belief as to Steel's intent at the time the joint account was opened. We hold, therefore, that the trial court erred in sustaining the motion to strike at the conclusion of plaintiff's case.

We find no merit in Higgins' final assignment of error that the trial court erred in refusing to admit into evidence the will of Albert Steel, who predeceased Higgins' decedent in 1965. As Bowdoin argues, the husband's will did not mention the funds ultimately placed in the joint account; the joint account had not been opened at the time Steel's husband died; and after her husband's death, Steel changed her will so that it no longer comported with her husband's will. We hold that the trial court did not err in excluding Albert Steel's will as irrelevant.

In light of all the foregoing, the judgment appealed from will be affirmed in part, reversed in part, and the case remanded for further proceedings consistent with this opinion.

*Affirmed in part,*
*reversed in part,*
*and remanded.*