PRESENT: All the Justices

IN RE: ROY L. WATFORD, III

Record No. 161187

OPINION BY
JUSTICE CLEO E. POWELL
March 1, 2018

UPON A PETITION FOR A WRIT OF ACTUAL INNOCENCE

Roy L. Watford, III, ("Watford") petitions this Court to grant a writ of actual innocence

based on biological evidence pursuant to Code § 19.2-327.2 *et seq.*

## I. BACKGROUND

On September 14, 1977, twelve-year-old A.C. was brought into the emergency room of

the Portsmouth Naval Hospital by her mother. A.C. reported that, at around 9:30 p.m. that

evening, she had been raped and sodomized. While A.C. was being treated in the Emergency

Room, a Physical Evidence Recovery Kit ("PERK") was administered. In a document titled

"Doctor's Report of Alleged Rape" (the "Doctor's Report"), the examining physician, Lt.

Commander D. Matey ("Dr. Matey"), recorded the alleged offenders as "Skip, Anthony, Vale

Waffer."[1] Additionally, a "Request for Laboratory Examination" form dated September 14,

1977, similarly identifies the "suspect(s)" as "Skip, Anthony and Vale Waffer." However,

"Skip" and "Vale Waffer" are crossed out. In noticeably different handwriting, "Roy W. III" is

written above "Skip" and "Evelio Watford" is written above "Vale Waffer."[2]

---

[1] The Doctor's report does not indicate who made this identification.

[2] It was subsequently determined that Watford's nickname was "Skip." The other two
names refer to Watford's younger brothers, Anthony, who was fifteen years old at the time, and
Evelio, who was seventeen years old.

Upon receiving the report of the rape, Detective S. Kaiser of the City of Portsmouth Police Department was dispatched to the emergency room. Detective Kaiser met with A.C. and her mother. A.C. confirmed to Detective Kaiser that she had been "raped by three black males who were known to her." She also reported that she had been anally sodomized.

Detective Kaiser subsequently took A.C. and her mother back to the area where the crimes occurred, and A.C. pointed out two houses. The first house she identified as the home of one of her attackers. The car parked in the driveway of the house was registered to Watford's father. Watford did not reside with his father; he lived with his grandparents at a different address.[3] However, Watford's younger brothers, Evelio and Anthony, did reside at that house.

The second house A.C. pointed to was a vacant house on the same side of the street as the first house. A.C. identified this house as the location of the attack. Detective Kaiser then took A.C. and her mother back to the police station, where she attempted to conduct a taped interview with A.C. However, the detective was unable to complete the taped interview because A.C. had "trouble relating the occurrence." A.C. was also unable to complete a written statement.[4]

The next day, Detective Kaiser interviewed A.C. again. According to A.C., during the attack, "someone had thrown a heavy bedspread or bed sheet over her face to keep her from screaming." Detective Kaiser and three other officers then conducted a search at the vacant house where the attack took place. There, they found a blue-grey quilt. Additionally, they cut a section from the mattress found in the house that appeared to have sperm on it.

---

[3] Watford had been living with his grandparents since he was six years old.

[4] A.C. purportedly gave Detective Kaiser a description of her attackers. However, that description is not contained in the record.

2

On September 16, 1977, an arrest warrant was issued for Watford. The arrest warrant indicates that it was issued based on a sworn statement from A.C.'s mother. At the time, Watford was eighteen years old.

A.C.'s PERK, which included saliva, anal, and vaginal swabs, pubic combings, her blue jeans and her underwear, was submitted to the Bureau of Forensic Science ("BFS") for further testing, as was the quilt and the mattress cutting taken from the house. Hair and saliva swabs taken from Watford and his brothers were submitted to the BFS as well. Sperm was found on the vaginal swab, A.C.'s blue jeans, her underwear and the mattress cutting. BFS reported that of the eight hairs collected from the mattress cutting, only one was microscopically similar to Watford's hair;[5] none of the hairs collected from the pubic combings were determined to be microscopically similar to Watford.

Watford was indicted in the Circuit Court for the City of Portsmouth for rape and sodomy. On March 23, 1978, Watford pled guilty to rape. The circuit court, pursuant to the Commonwealth's motion, dismissed the indictment for sodomy. On June 14, 1978, the circuit court sentenced Watford to ten years' imprisonment, entirely suspended for a period of ten years.[6] Watford did not appeal.[7]

In 2010, several pieces of evidence in this case were subjected to DNA testing. The Virginia Department of Forensic Science ("DFS") issued a certificate of analysis on August 6, 2010. The certificate of analysis indicated that the DNA recovered from the vaginal swab,

---

[5] That same hair was also determined to be microscopically similar to that of Anthony.

[6] In his petition, Watford asserts that his sentence was pursuant to a plea agreement. However, there is no evidence in the record to support this claim.

[7] Evelio was tried in the Portsmouth Juvenile and Domestic Relations Court and found "not innocent." The charges against Anthony were dismissed.

A.C.'s blue jeans and the mattress cutting came from three different contributors.[8]  A comparison of these DNA profiles against the saliva swabs of Evelio and Anthony eliminated them as possible contributors of the genetic material on the vaginal swabs, A.C.'s blue jeans and the mattress cutting.  Watford could not be eliminated as a contributor, as DFS was unable to develop a DNA profile for him from the saliva swab that had previously been collected.

In 2016, a buccal swab was obtained from Watford.  A second certificate of analysis was issued on June 17, 2016, stating that Watford had been eliminated as a possible contributor to the genetic material on the vaginal swab, A.C.'s blue jeans and the mattress cutting.

On August 15, 2016, Watford petitioned this Court for a writ of actual innocence based on biological evidence, pursuant to Code § 19.2-327.2 *et seq.*  The Commonwealth moved to dismiss the petition.  After the parties had filed their briefs, this Court, recognizing that the record in this case was insufficient to resolve Watford's claim of actual innocence, directed the Circuit Court of the City of Portsmouth to conduct an evidentiary hearing pursuant to Code § 19.2-327.4 and to make several factual findings.

At the evidentiary hearing, A.C. testified regarding what she recalled from the day of the attack.  A.C. was specifically asked if she had seen Watford at all on the day of the attack.  She responded that she had not.  She did, however, see Evelio, after she entered the vacant house, just before she was sexually assaulted.  When she was asked if she had named Watford as one of her attackers, she responded "I can't remember I did."  When the circuit court pressed her on the

---

[8] The certificate of analysis indicates that a total of four DNA profiles were developed: one from the vaginal swab, one from the blue jeans and two from the mattress cutting.  However, DFS could not conclusively eliminate the possibility that the DNA profiles developed from the vaginal swab and A.C.'s blue jeans came from the same individual.  Therefore, the DNA profiles found on the vaginal swab and the blue jeans were treated as though they came from the same contributor.

4

matter, she stated, "I don't remember, no. I don't remember naming him." She then stated that she remembered naming Evelio. Additionally, when asked if she knew Watford's nickname at the time of the offense, she said she did not.

Robert Jenkins ("Jenkins") was also called as a witness. At the time of the attack, Jenkins was 13 years old and lived in the house between the vacant house and the house where Watford's brothers lived. Jenkins testified that he remembered being in front of his house with a friend on the day of the attack. According to Jenkins, he was familiar with Watford and did not see him at all that day.

The circuit court also heard testimony from Joseph Brown, III ("Brown"), who stated that he and a friend were walking by the vacant house on the day of the attack, when they heard a girl screaming inside. Brown stated that he and his friend went into the house, saw A.C. and some guys Brown did not know, and took A.C. out of the house. Brown further testified that he knew Watford and he did not see him in the house.[9]

After it heard all of the evidence, the circuit court returned its findings of fact to this Court. Notably, the circuit court found that A.C. was "certain that she saw Evelio Watford immediately before she was attacked and never saw Roy Watford." Further, A.C. "did not know [Watford's] nickname was Skip" and she "could not remember if she specifically named Roy Watford in her description to Detective Kaiser."

## II. ANALYSIS

In his petition, Watford relies on the fact that his DNA profile does not match the DNA profile developed from the vaginal pool swab or the DNA profile developed from the mattress cuttings. Watford acknowledges that he pled guilty to the crime, but claims that he only pled

---

[9] Brown also stated that did not see Evelio in the house.

5

guilty because his "grandfather prevailed on him to plead guilty and go home that day." Watford further notes that, according to the circuit court files, A.C. was confused about what happened during the attack and never actually identified him as one of her attackers.

In response, the Commonwealth asserts that, "[a]lthough this case is unsettling," a writ of actual innocence should not issue in this case because Watford's DNA evidence does not conclusively establish that he was not one of the men who raped A.C. The Commonwealth notes that A.C. was raped by at least three men, but only a single DNA profile was developed from the vaginal swabs. Therefore, according to the Commonwealth, the lack of a DNA match did not eliminate Watford as one of the perpetrators; it merely eliminated him as the contributor of the DNA taken from the vaginal pool swabs.[10] Thus, the Commonwealth asserts that, because the DNA evidence does not conclusively eliminate Watford as a perpetrator, he cannot establish a valid basis for relief under Code § 19.2-327.5 and, therefore, his guilty plea must stand.

Before we address the merits of Watford's petition, we must address the changes that have been made to the actual innocence statutes, Code § 19.2-327.2 *et seq*., since the last time this Court had occasion to analyze them. Effective July 1, 2013, the General Assembly amended

---

[10] In its motion to dismiss, the Commonwealth also relied on "A.C.'s unrecanted identification of Watford as one of the perpetrators" in the Doctor's Report. Such reliance is misplaced because, as the evidentiary hearing demonstrates, the identification of Watford as one of A.C.'s assailants in the Doctor's Report is, at best, hearsay. Notably, A.C. did not fill out the Doctor's Report, Dr. Matey did. As it is highly unlikely that Dr. Matey had any first-hand knowledge of who raped A.C., it appears that the Commonwealth assumed that the identification came from A.C. Given her testimony at the evidentiary hearing, this is questionable. Although A.C.'s recollection of some of the facts from that day was unclear, she was unequivocal in her testimony that she had not seen Watford at all on the day of the attack. Furthermore, if she had, in fact, identified Watford as one of her assailants, it is highly unlikely that she would have done so using his nickname, when she explicitly stated that she did not know that Watford's nickname was "Skip." Thus, the only logical conclusion is that the identification of Watford and his brothers came from an out-of-court statement by an unknown third-party.

6

the statutory burden of proof that must be met before a petitioner can receive a writ of actual innocence. 2013 Acts chs. 170 & 180 (codified as amended at Code §§ 19.2-327.3(A)(vii), 19.2-327.5, 19.2-327.11(A)(vii), and 19.2-327.13). As a result, petitioners are no longer required to prove that "no rational trier of fact *could* have found proof of guilt beyond a reasonable doubt;" instead, they are now required to prove that "no rational trier of fact *would* have found proof of guilt beyond a reasonable doubt." *See* Code §§ 19.2-327.3(A)(vii), -327.5, -327.11(A)(vii), and -327.13 (emphases added). This case presents our first opportunity to address what effect, if any, the change from "could" to "would" has upon the resolution of actual innocence cases.

> In construing legislation, we are aided by the legislature's evident interpretation of its earlier enactments, we will assume that its amendments to the law are purposeful and not unnecessary or vain, we will presume that the legislature acted with full knowledge of the law as it stood bearing on the subject with which it proposed to deal, and we will adopt that construction which gives effect to the legislative purpose.

*Cape Henry Towers, Inc. v. Nat'l Gypsum Co.*, 229 Va. 596, 600-01, 331 S.E.2d 476, 479 (1985) (internal citations omitted).

Our analysis begins by examining the plain meaning of the original and the amended words. In this context, the word "could" is the conditional form of "can," and denotes the conditional ability to perform some act. Webster's Third New International Dictionary 323, 517. (1993); *see also Lawlor v. Commonwealth*, 285 Va. 187, 248, 738 S.E.2d 847, 882 (2013) (defining "could" as having the capability to perform some act). In the context of actual innocence analysis, it has been recognized that "the use of the word 'could' focuses the inquiry on the power of the trier of fact to reach its conclusion." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). "[T]he question [of] whether the trier of fact has [the] power to make a finding of guilt requires a binary response: Either the trier of fact has power as a matter of law or it does not." *Id.* Stated another way, the word "could" "emphasizes the authority of the fact-finder to make

7

conclusions from the evidence" and "establishes a standard of review for the sufficiency of record evidence." *Id.* at 333 (J. O'Connor, concurring).

The General Assembly's use of the word "could" in the previous version of the actual innocence statutes effectively limited our review of a petition to whether sufficient evidence existed to support the conviction. *Cf. Commonwealth v. White*, 293 Va. 411, 422, 799 S.E.2d 494, 500 (2017) ("The sufficiency standard asks whether a rational jury *could* have found the defendant guilty."). In order for a petitioner to succeed under the "could" standard, any newly discovered evidence, regardless of whether it is biological or non-biological, must undermine the evidence presented at trial to such a degree that it effectively renders the other evidence insufficient to support the conviction. *See, e.g.*, *Montgomery v. Commonwealth*, 62 Va. App. 656, 676-77, 751 S.E.2d 692, 701-02 (2013) (granting writ of actual innocence where the petitioner established that his conviction resulted from perjury committed by the complaining witness, thereby establishing that the record lacked evidence of his guilt); *Copeland v. Commonwealth*, 52 Va. App. 529, 531-32, 664 S.E.2d 528, 529-30 (2008) (granting a writ of actual innocence when post-conviction scientific analysis of the evidence established that a required element could not have been proved beyond a reasonable doubt). Stated differently, under the previous standard, it was unnecessary for the Court to consider the likelihood of a conviction if the new evidentiary record rose above the bare sufficiency threshold.

Such an approach imposes a significant burden upon a petitioner: it requires him to prove "that [he] did not, as a matter of fact, commit the crime for which [he was] convicted." *See Carpitcher v. Commonwealth*, 273 Va. 335, 345, 641 S.E.2d 486, 492 (2007). As the "could" standard required a petitioner to prove that the evidence was insufficient, a petitioner under that standard was required to eliminate the possibility that he could have been convicted. In other

8

words, the "could" standard effectively required that a petitioner prove his innocence beyond any reasonable doubt.

In contrast, the word "would" is the conditional form of the word "will," and denotes a "desire or inclination to act in a particular way in contrast to means or ability." Webster's Third New International Dictionary 2617, 2637-38. (1993); *see also Lawlor*, 285 Va. at 248, 738 S.E.2d at 882 (defining "would" as having the inclination to perform some act). The word "would" is, in some contexts, "at the other side of the reasonable-doubt spectrum" from the word "could." *White*, 293 Va. at 422, 799 S.E.2d at 500. In the present context, the use of the word 'would' focuses the inquiry not on the ability to convict, but "on the likely behavior of the trier of fact" in deciding its verdict. *Schlup*, 513 U.S. at 330. It requires the Court to "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329.

By changing "could" to "would," the General Assembly has fundamentally changed the nature of our inquiry in actual innocence cases. The General Assembly's amendment of the actual innocence statutes has shifted the focus from the jury's raw ability to convict (the "could" standard) to the jury's volition to convict (the "would" standard), thereby significantly broadening the scope of our review in considering whether or not to grant a writ of actual innocence. Through the use of the word "would," the General Assembly has directed us to examine the "probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Id.* at 332. Thus, we are required to look beyond whether the evidence is sufficient to sustain the conviction; we must also examine the likelihood of a reasonable juror[11]

---

[11] The term "reasonable juror" presumes a juror that fairly considered all of the evidence presented, including the newly discovered evidence. "It must also be presumed that such a juror

9

finding the petitioner guilty beyond a reasonable doubt once all of the evidence has been fairly

considered. *Id.*

This probabilistic approach still places a considerable burden upon the petitioner. It is

not enough for a petitioner to merely establish the existence of some conflicting evidence that

introduces the possibility of reasonable doubt. Rather, the petitioner must prove, by clear and

convincing evidence[12], that "*no* rational trier of fact would have found proof of guilt beyond a

reasonable doubt." Code § 19.2-327.5 (emphasis added). In other words, a petitioner's evidence

must do more than establish the theoretical possibility that a rational fact finder would choose to

acquit; it must establish such a high probability of acquittal, that this Court is reasonably certain

that no rational fact finder would have found him guilty.

Having determined the effect of the General Assembly's amendment upon the actual

innocence statutes, we now address the merits of Watford's petition. Our analysis begins by

---

would conscientiously obey the instructions of the trial court requiring proof beyond a
reasonable doubt." *Schlup*, 513 U.S. at 329.

[12] This Court has defined clear and convincing evidence as
> "that measure or degree of proof which will produce in the mind of
> the trier of facts a firm belief or conviction as to the allegations
> sought to be established. It is intermediate, being more than a
> mere preponderance, but not to the extent of such certainty as is
> required beyond a reasonable doubt as in criminal cases. It does
> not mean clear and unequivocal."

*Fred C. Walker Agency, Inc. v. Lucas*, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975) (quoting
*Cross v. Ledford*, 120 N.E.2d 118, 123 (Ohio 1954)). *See also* Black's Law Dictionary 674
(10th ed. 2014) (defining clear and convincing evidence as "evidence indicating that the thing to
be proved is highly probable or reasonably certain").

By requiring clear and convincing evidence, Virginia law differs from the less demanding
"more likely than not" standard used by federal habeas courts. *See, e.g.*, *House v. Bell*, 547 U.S.
518, 538 (2006) ("A petitioner's burden at the gateway stage is to demonstrate that more likely
than not, in light of the new evidence, no reasonable juror would find him guilty beyond a
reasonable doubt — or, to remove the double negative, that more likely than not any reasonable
juror would have reasonable doubt.").

10

noting that the existence of newly discovered DNA evidence is the threshold requirement that must be met before the Court will even consider a petition for a writ of actual innocence based on previously unknown human biological evidence. *See* Code § 19.2-327.3(A)(iii)-(iv). Here, it is uncontested that Watford's DNA evidence meets this threshold requirement. Therefore, we must examine whether Watford has carried his burden under Code § 19.2-327.5.

Our analysis, however, is not limited to only considering the newly discovered DNA evidence. Under Code § 19.2-327.5, the decision to grant or dismiss a petition for a writ of actual innocence requires this Court to consider "the petition, the response by the Commonwealth, previous records of the case, the record of any hearing held under this chapter and the record of any hearings held pursuant to § 19.2-327.1, and if applicable, *any findings certified from the circuit court pursuant to § 19.2-327.4*."[13] (Emphasis added.) In other words, the statute effectively requires us to draw our conclusion from a hypothetical new trial in which a rational factfinder hears all of the evidence in the aggregate, including: any records from the original case, the evidence presented at the original trial, the newly discovered biological evidence, any additional factual proffers made by the petitioner or the Commonwealth[14], and the

---

[13] Code § 19.2-327.4 states, in relevant part:
> If the Supreme Court determines from the petition, from any hearing on the petition, from a review of the records of the case . . . or from any response from the Attorney General that a resolution of the case requires further development of the facts under this chapter, the court may order the circuit court to conduct a hearing . . . to certify findings of fact with respect to such issues as the Supreme Court shall direct.

[14] *See* Code § 19.2-327.3(C) (permitting the Commonwealth to include, in its response to the petition, "a proffer of any evidence pertaining to the guilt or delinquency or innocence of the petitioner that is not included in the record of the case, including evidence that was suppressed at trial."); Rule 5:7B(f)(2) (same); *see also Schlup*, 513 U.S. at 328 (holding that a federal habeas court reviewing an actual innocence claim "must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally

11

evidence adduced at the evidentiary hearing held pursuant to Code § 19.2-327.4.[15] It is only

after the totality of the evidence is considered that we can determine whether to grant or deny the

writ.

Turning first to the evidence related to the trial below, we note that, due to the limited

record in this case, we only have Watford's guilty plea and its attendant circumstances to

consider. Given this Court's recognition that a guilty plea is a "self-supplied conviction" that

acts as "a waiver of all defenses other than those jurisdictional," *Peyton v. King*, 210 Va. 194,

196, 169 S.E.2d 569, 571 (1969), at first blush, it would not appear to be unreasonable to rely on

Watford's guilty plea as dispositive. However, Code § 19.2-327.2 expressly permits individuals

who have pled guilty to a Class 1 felony, a Class 2 felony, or "any felony for which the

maximum penalty is imprisonment for life" to seek a writ of actual innocence. Therefore, a

guilty plea cannot be dispositive of whether a writ of actual innocence will issue for the limited

class of cases for which the General Assembly has expressly provided an exception. To hold

otherwise would render Code § 19.2-327.2 meaningless, a result we must avoid unless absolutely

necessary. *Hubbard v. Henrico Ltd. P'shp.*, 255 Va. 335, 340, 497 S.E.2d 335, 338 (1998)

("every part of a statute is presumed to have some effect and no part will be considered

meaningless unless absolutely necessary."). Accordingly, the existence of a guilty plea is only

one of many factors to consider in our probabilistic analysis.

---

admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have
been wrongly excluded or to have become available only after the trial'").

[15] We recognize that this amalgamation of old and new evidence necessarily may give
rise to new theories of guilt or innocence that were not previously raised. Accordingly, in
keeping with our "new trial" analogy, the petitioner and the Commonwealth are also free to
assert new or modified theories of innocence or guilt to correspond with their competing
interpretations of the aggregate facts.

In determining the weight that must be afforded Watford's guilty plea, we note that a guilty plea "admits all the criminating facts alleged and the statutory elements of the offense charged." *Hobson v. Youell*, 177 Va. 906, 912, 15 S.E.2d 76, 78 (1941). Stated differently, a guilty plea allows a reviewing court to presume that sufficient evidence existed to support the conviction. Such a presumption may be strengthened by taking evidence in conjunction with the guilty plea. *See Starrs v. Commonwealth*, 287 Va. 1, 11, 752 S.E.2d 812, 819 (2014) (recognizing that, notwithstanding the fact that "a guilty plea obviates the need for evidence to establish guilt[,] . . . a trial court may nevertheless hear evidence."). While it is true that the primary purpose of hearing evidence in conjunction with a guilty plea is "to determine whether an accused is guilty or not and the measure of guilt," *Smyth v. Morrison*, 200 Va. 728, 734, 107 S.E.2d 430, 434 (1959), such evidence has the ancillary effect of more fully developing the record, thereby providing a reviewing court with evidence against which any newly discovered evidence may be compared. The record in the present case, however, is devoid of any mention of facts supporting Watford's guilty plea. Thus, we view Watford's guilty plea as merely establishing the basic presumption that sufficient evidence existed to support his conviction.

Moreover, we note the unusually light sentence that Watford received for a particularly heinous crime. Remarkably, Watford did not spend a single night in prison for the rape of a twelve-year-old girl. Such a light sentence adds credibility to Watford's assertion that he only pled guilty to accommodate his grandfather, especially when Watford's youth and mental

13

capabilities are also considered.[16]  In light of these facts, we accord Watford's guilty plea little weight in our analysis. [17]

Turning next to the DNA evidence, we note that A.C. was raped by multiple perpetrators but only one DNA profile was developed that can confidently be associated with the rape.[18] Excluding Watford as the donor of that DNA profile only indicates that the DNA profile was not developed from his sperm; it does not exclude the possibility the he was one of the other two assailants.[19]  At best, the DNA evidence establishes that it is 33% less likely that Watford was one of the perpetrators.  Thus, while we accord the DNA evidence some weight in our analysis, we recognize that - on the record presented in this petition - the DNA evidence alone does not

---

[16] According to Watford's pre-sentence report, his I.Q. was between 75 and 87.

[17] We note that, if the record contained a plea colloquy indicating that Watford voluntarily and intelligently entered his guilty plea, *see* Rule 3A:8, our analysis of this issue and the weight afforded the guilty plea would likely be significantly different.

[18] In his petition, Watford acknowledges that it is "conceivable" that the sperm on the mattress cutting was "deposited at a different time from the rape."  The Commonwealth agrees with Watford's assessment.  At the evidentiary hearing, testimony was presented indicating numerous consensual sexual encounters occurred in the vacant house.  Therefore, it cannot conclusively be established that the DNA profiles developed from the mattress cutting are associated with the rape of A.C.  In such a context, any conclusions derived from these DNA profiles would be entirely speculative and, as such, deserve no weight.
For similar reasons, we also give no weight to the analysis BFS conducted on the hairs found on the mattress cutting.

[19] Watford makes much of the fact that all three of the Watford brothers were eliminated as contributors to the DNA profile.  According to Watford, because the Watford brothers were the only suspects in the crime, the elimination of all three as contributors to the single DNA profile conclusively related to the crime means that none of them could have committed the crime.  Such simple logic, while inviting, is flawed.  In actuality, the only conclusion that may be drawn from this evidence is that one of the assailants was not one of the Watford brothers.  It certainly does not eliminate the possibility that Watford was one of the other assailants.

14

establish, by clear and convincing evidence, that no rational factfinder would have found Watford guilty.

However, the evidence adduced at the evidentiary hearing is a different matter entirely. A.C. unequivocally testified that she never saw Watford on the day of the attack. At first blush, her testimony would appear to be in conflict with the fact that Watford was named as a suspect in the Doctor's Report. Any such conflict is derived from the assumption that it was A.C. who identified Watford as a suspect to Dr. Matey. Although we have no way of knowing who actually identified Watford as a suspect to Dr. Matey, A.C.'s testimony makes it highly unlikely that she was the source of the identification. Notably, she testified that she did not recall ever identifying Watford as one of her attackers. She does, however, remember naming Evelio as a person she saw in the house. Moreover, it is telling that Watford was identified in the Doctor's Report as "Skip." A.C. unequivocally testified that she did not know Watford by that name. Thus, it is highly unlikely that A.C. would have identified Watford using a nickname that she did not know. Finally, and perhaps most persuasive, is the fact that the only person that A.C. conclusively identified as being in the vacant house was Evelio. If A.C. did not see Watford at all on the day of the attack and could not identify his voice, then she could not have identified him as being one of her attackers.[20]

It is further worth noting that A.C.'s testimony that she did not see Watford on the day of the attack is corroborated, to some degree, by the testimony of Brown and Jenkins. Brown testified that he did not see Watford when he entered the vacant house after the attack. Jenkins

---

[20] It is further worth noting that the facts of this case present a number of logical reasons for how Watford could have been incorrectly identified as a suspect, especially considering the fact that A.C. admittedly entered the vacant house because she thought it was Watford's house.

testified that, on the day of the attack, he could see who was coming and going from the vacant house and did not see Watford.

When all of this evidence is considered, we find that it is highly unlikely that any rational factfinder would have found Watford guilty beyond a reasonable doubt. Indeed, the Commonwealth cannot point to any evidence that establishes that Watford was at the vacant house on the day of the attack, much less that he was one of the perpetrators of the crime. Accordingly, we hold that Watford has proved, by clear and convincing evidence, that no rational trier of fact would have found proof of his guilt beyond a reasonable doubt.

## III. CONCLUSION

Having considered Watford's petition, the response of the Commonwealth, the records of the case, the DNA evidence and the findings of fact certified from the circuit court pursuant to Code § 19.2-327.4, the Court finds that Watford has proved, by clear and convincing evidence, all of the allegations required under Code § 19.2-327.3(A) and that no rational trier of fact would have found him guilty beyond a reasonable doubt. Accordingly, the Court hereby grants Watford's petition for a writ of actual innocence and vacates his conviction.

*Petition granted.*