PRESENT:  All the Justices

IN RE:  WINSTON L. SCOTT

Record No. 171286

OPINION BY
JUSTICE S. BERNARD GOODWYN
March 7, 2019

UPON A PETITION FOR A WRIT OF ACTUAL INNOCENCE

Winston Lamont Scott (Scott) filed a petition for a writ of actual innocence based on biological evidence pursuant to Code § 19.2-327.2, *et seq*.  Upon reviewing the totality of the evidence, including the records from the original case, the evidence presented at the original trial, the newly discovered DNA evidence, and additional factual proffers made by the petitioner and the Commonwealth, the Court is of opinion that the petition should be granted and the writ of actual innocence be issued.

BACKGROUND

*A.  Criminal Investigation*

On July 24, 1975, at approximately 5:25 a.m., the Fairfax County Police Department received a telephone call about a rape that had occurred at an apartment in Reston, Virginia.  A police unit arrived a few minutes later and interviewed the victim, JD,[1] about the attack.

According to a report completed by Investigator Larry Wilkins (Investigator Wilkins), he collected "the clothing that the victim wore during the attack and the clothing the victim put on after the attack," which were put in separate bags and marked.  JD was transported to the hospital.  The police unit put "all evidence and property . . . in separate envelopes," including various samples taken from JD at the hospital, and placed them in the property room at the police station.

_____

[1] The victim is referred to by her initials.

During the investigation, JD helped the police create a composite sketch of her attacker. The police presented an initial photo line-up, but JD was unable to identify a suspect.

On September 24, 1975, Fairfax police interviewed a witness regarding an unrelated crime. They showed the witness the composite sketch and asked her if she knew anyone resembling the person in the sketch. The witness suggested that the composite resembled Scott, her brother's friend. After retrieving a photo of Scott, the police arranged a photo line-up for JD on September 26, 1975, which included the photo of Scott. JD picked the photo of Scott. Scott was arrested on September 29, 1975.

*B. Trial and Conviction*

The Circuit Court of Fairfax County tried Scott on January 26, 1976 for one count of rape, one count of carnally knowing the victim with the mouth, and one count of burglary. Scott pled not guilty to all three counts.

At trial, JD testified that on the night before the attack, she left her balcony door open before she went to sleep, and that she was alone in the apartment because her only roommate spent the night elsewhere. JD said she woke up to see a man standing beside her bed at about 4:30 a.m. She testified: "He just told me if I did what he told me to do he wouldn't hurt me." She immediately felt "shocked and very frightened."

JD testified that her drapes were drawn, and the room was dark except for some light from a "pole light" outside. She did not get a good look at the man.

JD testified that he "walked over to the side of the bed . . . pulled the bed covers off . . . and shone his flashlight on me." She said he never put the flashlight on his face, however. JD was only wearing a flannel shirt which the attacker pulled up around her shoulders. JD testified that the perpetrator fondled her breasts with his mouth, put his tongue on her vagina

2

for thirty seconds to a minute, and then penetrated her with his penis for about a minute before he climaxed. She testified that the perpetrator asked her several questions, but she could not speak because she was so frightened. The perpetrator took some money out of her purse and then he left. She assumed that he left through the balcony door. JD estimated that the whole episode lasted about 15 minutes.

JD testified that after her attacker left, she got up and called her boyfriend, RN,[2] who arrived about 25 minutes later. She said that RN called the police from her apartment. The police arrived at her apartment about ten minutes later. She identified Investigator Wilkins as one of the officers who eventually arrived at the scene. After the police conducted their initial investigation, JD testified that she went to the hospital and was examined by Dr. William Enos (Dr. Enos).

JD testified she subsequently helped the police create a composite sketch of her attacker using generic photographs and descriptions and that she was satisfied with the sketch. The sketch was admitted into evidence.

JD testified that Investigator Wilkins showed her some photographs of men fitting the description several days after the attack, but she did not identify any of the photographed men as her attacker. JD stated that Officer Donald Neese (Officer Neese) showed her a second photo line-up about a month or so later. She identified one of those photos as her attacker. It was a photograph of Scott. In the courtroom, JD identified Scott as her attacker.

Officer Neese testified that he conducted the second photo line-up on September 26, 1975. He stated that he presented JD with six photos of males similar to the composite sketch, and that she identified the photo of Scott as her attacker.

_____

[2] The victim's boyfriend is referred to by his initials.

3

Dr. Enos, a pathologist at Northern Virginia Doctors Hospital and the designated forensic pathologist for the Commonwealth of Virginia, testified that he examined JD at about 9:30 a.m. on the morning JD was attacked. He testified that he found no evidence of recent trauma, such as lacerations or bruises, and his examination of JD's "labia, vaginal orifice, hymen, vagina, cervix, et cetera were essentially negative." He took a vaginal swab.

Dr. Enos said he found spermatozoa in JD's vagina. He stated that he "processed the material from the vaginal wall for a chemical known as acid phosphatase." The test suggested to him "that the semen had been deposited there within a relatively short period of time." He estimated that the semen was deposited within five hours of his examination of JD.

Dr. Enos testified that Investigator Wilkins brought Scott to Dr. Enos for a blood draw on November 10, 1975. Dr. Enos said both JD and Scott had blood type O.

At the conclusion of the Commonwealth's evidence, Scott moved to strike the evidence. The circuit court denied the motion.

As his first witness, Scott called Mary Jane Burton (Burton),[3] a forensic scientist who worked for the Commonwealth at the Bureau of Forensic Science in Richmond as the head of forensic serology. The court qualified Burton as an expert witness in "bodily secretions." She testified that she analyzed a vaginal swab from JD and a substance found in the crotch of the jeans "that were reportedly worn by the victim" after the attack. She identified the substance on the jeans as sperm.

When Scott asked about Dr. Burton's tests of the sperm, the Commonwealth objected to the chain of custody of the jeans. In response, Scott called Investigator Wilkins to establish the jeans' chain of custody.

---

[3] Burton's name was mistakenly spelled as "Burten" in the trial transcript.

4

Investigator Wilkins stated that the jeans were handed to him by police personnel in the apartment the morning of the attack. He said he put the jeans in a plastic envelope, the Criminal Investigation Division "bagged and tagged" them, and then the Division personnel stored them in the property room the same day as the attack. Investigator Wilkins stated he sent the jeans to the Northern Virginia Crime Laboratory twice for testing in Richmond: first on August 18, 1975, and then again on November 10, 1975. He stated that he stored the jeans in the same property room between the two tests. Investigator Wilkins concluded that the jeans he received the morning of the attack were the same jeans he received from the lab "[w]ithout any doubt whatsoever."

The Commonwealth renewed its objection for lack of a proper chain of custody. The court noted the chain of custody was properly established except for this "small link" about who handed the jeans to Investigator Wilkins. Rather than call JD back, the circuit court sought an agreement regarding the chain of custody. The parties agreed. The Commonwealth stipulated on the record: "[T]he jeans in question are the victim's jeans that were taken from her apartment that morning," and were the same jeans transported to the lab.

Burton noted that a person's bodily secretions correspond to their ABO factors in blood. A September 19, 1975 DFS Certificate of Analysis (September 1975 COA) prepared by Burton identifying "Item E – Jeans worn by victim" was admitted into evidence. The COA prepared by Burton states that "spermatozoa was identified in a stain on the crotch area of the blue jeans. Further tests on this stain indicates that the secretions are Type A." Burton returned to the stand to describe the results of her serological tests on the substance found in the crotch of the jeans. Therefore, a "man with type O blood could not emit type A semen."

5

Burton explained that because of what Investigator Wilkins referred to as "a discrepancy in the analysis," the jeans were resubmitted to the crime lab on November 10, 1975 for retesting. Upon retesting in November, the retest indicated that the secretion on the jeans was type O. The resulting November 1975 COA regarding the retest of the "jeans worn by victim" was offered into evidence by the Commonwealth, and was also admitted into evidence by the circuit court.

Burton explained that the discrepancy between the two test results could possibly be because the jeans were stored in a plastic bag while the stain was still wet, and bacteria grew that caused a different reaction and test result. She testified that, after realizing there might be "a problem with the test result," she took a sample from the edge of the semen stain for the November test—rather than a sample closer to the middle of the stain like the prior test—because "this is the part that would have dried before it was sealed up" and would be less likely to have bacterial growth.

Burton testified that she did not test the original stain for bacteria, and she did not know whether bacteria were present in the sample. She admitted that she did not see any, but the conditions "were right for the growth of bacteria." She concluded by stating "obviously it cannot be both A and O, but my tests showed the first time that it was A, the second time O. Now, if indeed bacteria were present, this would explain A, but I do not know of my own knowledge that bacteria were present." In its closing, the Commonwealth argued that the testing was inconclusive and should not be considered by the jury. The defense argued that the first test result indicated Scott's innocence.

Scott testified that on July 23, 1975, he spent the day helping Bobby Reid (Bobby) paint Bobby's parents' house. Scott said he remembered this day because Bobby's father came home with a new lawn mower. He stated he ate dinner at a shopping mall and stayed out with Bobby

6

and other friends at the mall until around 11:30 p.m. when he and Bobby returned to Bobby's house to go to bed. Scott testified that he slept in Bobby's brother's room alone, and fell asleep around 1:00 a.m. Scott testified he did not leave the room during the night. He testified that he did not own a car at the time. He said he awoke around 8:00 a.m. the next day to continue painting the house before going to his job at 4:00 p.m.

Bobby testified that he remembered his father bought a lawnmower on July 23, 1975, and that Scott helped him paint that day. Bobby confirmed that he hung out with Scott at the mall and returned to his parents' home around 11:00 p.m. with Scott. He stated that Scott slept in his brother's room, and said he saw Scott after they woke up the next morning.

Beverly Reid, Bobby's mother, testified she remembered July 23, 1975 because her husband bought a lawn mower that day. The lawn mower's receipt, dated "7/23/75," was introduced into evidence. She testified that Scott came back with Bobby around 11:00 p.m., which was Bobby's curfew, and spent the night. She confirmed Scott slept in Bobby's brother's room, and she said Scott was in the room when she checked on him the next day around 7:30 a.m. She also noted that her room in the house is over the driveway. At the request of defense counsel, she had measured the distance between her house and the apartment complex where the crimes occurred. She testified that the distance ranged between 4.7 to 4.9 miles, depending on the route taken.

After the closing arguments, the jury found Scott guilty on all three counts. The jury sentenced Scott to a total of 14 years' imprisonment: ten years for rape, three years for carnal knowledge, and one year for burglary. The circuit court imposed the jury's sentence.

7

*C. Post-Conviction Proceedings*

This Court refused Scott's appeal of his convictions on April 14, 1977. On March 6, 1978, Scott submitted a petition for writ of habeas corpus in the circuit court. After the Commonwealth filed a motion to dismiss the petition, the court granted leave for Scott to amend his petition. After the time to amend had passed without an answer from Scott, the court denied and dismissed the petition because of the failure to amend. Scott was granted discretionary parole on May 26, 1981.

*D. Biological Testing*

In 2005, Governor Mark Warner ordered the Department of Forensic Science (DFS) to test biological evidence collected and retained by DFS relating to criminal cases tried between 1973 and 1988, using DNA testing that was not available at the time the evidence was collected.[4]

Pursuant to this order, DFS conducted tests on biological evidence samples it retained from Scott's case. Specifically, the evidence submitted for DNA testing in this case included biological evidence from "vaginal swabs from victim," and "jeans worn by victim."

A Certificate of Analysis dated March 31, 2010 (March 2010 COA) was issued after DNA testing of JD's vaginal swabs and the stain on her jeans. DFS obtained DNA typing results from both the swabs and the stain. The COA includes a table of the typing results.

For the stain on the jeans worn by the victim, the March 2010 COA noted:

---

[4] *See In re Brown*, 295 Va. 202, 226 (2018) (citing Press Release, Governor Mark Warner, Governor Warner Announces Two Men Exonerated with Assistance of DNA Testing Not Available at Trial—Results of Random Sample Review of Old Serology Files Prompt Full-Scale Review (Dec. 14, 2005)).

- "DNA profiles indicative of a common contributor were developed from the sperm fractions (designated A-SP and B-SP)."[5]

- "The DNA profile developed from profile B-SP was searched against the Virginia DNA Data Bank and no DNA profile consistent with this profile was found."

- "DNA mixture profile was developed from the non-sperm fraction (designated A-NSP) . . . . [w]ithout a known DNA profile from [JD], no conclusions can be reached as to whether any of these DNA types are attributable to her."

- "DNA types were developed from the non-sperm fraction (designated B-NSP) . . . . [t]hese types can be attributed to the sperm fraction donor."

For the vaginal swabs, the March 2010 COA noted DNA types indicative of a male contributor were developed from the sperm fraction, but no DNA typing results were obtained from the non-sperm fraction of the sample. The March 2010 COA states that the DNA types indicative of a male contributor developed from the sperm fraction were of "no value" and due to the limited information obtained, the types were unsuitable for "comparison, searching against the Virginia DNA Data Bank or submission to the National DNA Data Bank." The March 2010 COA includes a table listing the DNA typing results obtained from the two jeans samples and the vaginal swab sample.

In 2017, DFS performed DNA testing on a buccal swab from Scott. An August 1, 2017 DFS Certificate of Analysis (August 2017 COA) reported the results from the DNA testing of that swab from Scott. It concluded that "Scott is eliminated as a contributor of the DNA profiles

---

[5] The "A" denotes the sample from the crotch of the jeans tested in September 1975. The "B" denotes the sample from the crotch of the jeans used for the retest conducted in November 1975. "SP" denotes a sperm fraction of the sample, and "NSP" denotes a non-sperm fraction of the sample. Thus, "A-SP" means the sperm sample fraction from the jeans' stain sample originally tested in September 1975, "A-NSP" means the non-sperm sample fraction from that jeans' stain, "B-SP" means the sperm sample fraction from the jeans' stain retested in November 1975, and "B-NSP" means the non-sperm sample fraction from that jeans' stain sample.

previously developed from the sperm fractions (designated A-SP and B-SP) from the stain in the crotch of the jeans worn by [JD] reported in the [March 2010 COA]."

A September 13, 2017 DFS Certificate of Analysis (September 2017 COA) reported the examinations of swabs taken from RN. It concluded that "[RN] is eliminated as a contributor of the DNA profiles previously developed from the sperm fractions (designated A-SP and B-SP) from the stain in the crotch of the jeans worn by [JD] reported in the [March 2010 COA]." Thus, both Scott and JD's boyfriend, RN, were eliminated as the contributors of the sperm found in the crotch of JD's jeans.

*E. Petition for Writ of Actual Innocence, Subsequent Pleadings, and Proffers*

After Scott received the DFS test results eliminating him and JD's boyfriend as contributors of the semen stain found on the jeans worn by the victim, Scott filed a petition for writ of actual innocence in this Court on September 28, 2017.

In his petition, Scott asserts that the DNA testing performed on the sperm fractions of cuttings from the crotch of JD's jeans yielded a single distinct male DNA profile, as noted in the March 2010 COA from DFS. The August 2017 COA from DFS, regarding DFS's testing of a buccal swab obtained from Scott, "eliminated [Scott] as a contributor of the DNA profile previously developed from the sperm fractions [designated A-SP and B-SP] from the stain in the crotch of the jeans worn by" JD. Further, a buccal swab obtained from JD's boyfriend at the time of the attack, who was JD's only consensual sexual partner during the relevant time period, was DNA-tested by DFS and the results eliminated JD's boyfriend as a contributor to the DNA profile developed from the sperm fractions obtained from the stain in the crotch of JD's jeans. Scott contends that the DNA profile from the sperm fractions of the semen stain on JD's jeans

10

therefore belonged to the perpetrator of the rape, and that the DNA evidence clearly and convincingly demonstrates that Scott is innocent of the burglary, sodomy, and rape charges.

DFS subsequently produced another COA on October 24, 2017 (October 2017 COA) regarding the DNA obtained from swabs obtained from JD. First, it unsurprisingly concluded that JD, a female, "is eliminated as a contributor of the DNA profiles previously developed from the sperm fractions (designated A-SP and B-SP) from the stain in the crotch of the jeans worn by [JD] reported in the [March 2010 COA]." It also noted:

> DNA types of no value and different from [JD] and the sperm fraction donor were previously developed from the non-sperm fraction from stain A in the crotch of the jeans worn by [JD] (Item E) reported in the [March 2010 COA].
>
> - Due to the limited information obtained, these DNA types are not suitable for searching against the Virginia DNA Data Bank or submission to the National DNA Data Bank.
>
> - DNA types attributable to the sperm fraction donor are present in this sample at six (6) loci.
>
> - DNA types attributable to [JD] are present in this sample at three (3) loci.

On December 7, 2017, the Commonwealth filed a motion to dismiss Scott's petition for writ of actual innocence. In its motion, the Commonwealth stated that it did not challenge the authenticity of the DFS-issued COAs or the validity of the test results reported. However, it questioned the probative value of the DNA test results.

The Commonwealth asserted in its motion that "[t]he mere exclusion of Scott and RN as contributors of the partial DNA profiles does not establish Scott's innocence because JD herself cannot be identified confidently from the human biological evidence tested." Thus, "no evidence proves Scott's claim that the . . . stain on [the] jeans belongs to the perpetrator."

The Commonwealth attached as an exhibit and thus proffered the October 2017 COA and supporting documentation from DFS. The Commonwealth noted that a handwritten and signed

11

note in the supporting documentation from DFS states that JD is not eliminated as a DNA contributor if there are three or more contributors (and one of the contributors is the sperm fraction donor) to the human biological evidence tested because her DNA profile is consistent with the partial DNA profile DFS developed at 3 loci. However, JD is eliminated as a DNA contributor if there are only two contributors (one of whom is the sperm fraction donor) because her DNA profile does not account for all the additional DNA types not attributable to the sperm fraction donor. Thus, the October 2017 COA is inconclusive regarding whether JD's DNA is found in the sample.

The Commonwealth contends that Scott's bid for exoneration fails because Scott cannot prove the connection between the stain on the jeans and the rape in that (1) JD is eliminated from a 2-donor sample that includes only the sperm fraction donor and one other, (2) JD may have put on clothing from her dirty laundry, (3) there was a shared laundry room at her apartment building, and (4) "[i]t is well-documented that sperm can withstand—and even be deposited during—laundering and still yield a DNA profile." Also, citing the differing serological results presented at trial, it claims that the trial evidence indicated that the sample may have been compromised or contaminated. Thus, it concludes that "Scott has not shown that the test results he presents are relevant to this case."

On or about April 27, 2018, Scott filed a pleading titled "Opposition to Commonwealth's Motion to Dismiss the Petition for Writ of Actual Innocence – Reply." With that document, Scott submitted post-trial affidavits and other exhibits as evidentiary proffers.

Scott proffered several statements made to his counsel by Lisa Schiermeier-Woods (Schiermeier-Woods), the DFS analyst who performed the 2017 testing on the reference samples

12

from Scott (August 2017 COA), RN (September 2017 COA), and JD (October 2017 COA), and who signed the certificates of analysis related to that testing. According to Schiermeier-Woods, although not stated in any of the certificates of analysis, "anyone eliminated from the sperm fraction [from the March 2010 COA] is also eliminated from the nonsperm fraction" of that sample. Additionally, according to Schiermeier-Woods, "there were six (6) loci in A-NSF that had DNA types attributable to the sperm fraction donor," and "three (3) loci in A-NSF that had DNA types attributable to the victim" as noted in the October 2017 COA. However, there were "two loci" where the victim and sperm donor shared alleles that could have been reported "as attributable to either the sperm fraction donor or the victim," but in her report she included them only in the number of loci she reported attributable to the sperm fraction donor.

Scott also submitted a transcript of an interview conducted on September 20, 2017 between JD and Detective Matthew Horn (Detective Horn) of the Fairfax County Police Department. In the interview, JD described the apartment she lived in the night of the incident. JD said she and her roommate lived in separate bedrooms, and thus JD was the only person living in her room at the time. She stated that the bathroom she went to immediately after the attack was not attached to her bedroom but was a shared bathroom. She also stated: "I don't remember a washer dryer in the unit so I'm thinking the washer dryer was downstairs in the basement or whatever."

JD also described her actions immediately after the attack, including putting on a pair of jeans. JD explained: "I don't doubt that I wore a pair of jeans" that "I put on before I went outside the bedroom." She also said: "They may have been the jeans I was wearing, you know, earlier that day . . . . It could have been out of the laundry. It could have been out of a drawer." After she left her bedroom, she said she "washed [her vagina] thoroughly."

13

JD also told Detective Horn about her sexual relationships prior to the incident. She said she doubted she had any consensual sexual relations with anyone other than her boyfriend, RN, "within a reasonable amount of time" before the attack. She did not remember if she had any sex with RN in the days leading up to the attack.

Finally, JD described the second photo line-up she did with Officer Neese two months after the attack. Although she noted no one told her one of the photos was of the suspect, she stated:

> I was never 100% sure of my recognition potential. But I said what if I were to say which one of these people, if I had to pick one of these photos as the person that I thought was in, you know, that raped me, it would be this person. And I pointed to a photo. And they said, okay. It's, that was the person who was in Ohio [Scott] . . . . I didn't feel like I had to pick somebody out . . . . I knew that . . . one of the photos in the lineup was probably the person . . . . I knew that they had somebody that they, you know, had some suspicions about and that I presumed that one of the photos was of that person.

Detective Horn also conducted a phone interview with JD's former boyfriend, RN, on October 2, 2017, and a transcript of that interview was proffered. RN stated he and JD "were seeing each other all the time," and were sexually active before the attack. He also did not use condoms when they had intercourse. As far as he knew, JD had no other sexual partners.

Scott also submitted another affidavit from his counsel in which his counsel swore to statements made to him by Detective Horn. It is noted in the affidavit that Detective Horn could not submit an affidavit because it is against Fairfax County Police policy.

Counsel proffered that Detective Horn stated: "JD confirmed that she was raped by a single perpetrator" during the September interview. He also proffered that, "Detective Horn also stated that JD said she had only one sexual partner around the time of the crime, her boyfriend, RN."

14

Also provided was an April 2018 affidavit from Investigator Wilkins, now retired. In the affidavit, he swore that in his supplementary report signed on July 25, 1975, any reference to "this unit" collecting the victim's clothing referred to himself. He said he collected any clothing JD wore during the attack and clothing she put on after the attack. Wilkins recalled standard operating procedure in rape cases was that he would collect the evidence personally. He stated: "I would only collect relevant items I felt had evidentiary value."

Scott also proffered a report from Nora Rudin, Ph.D. (Dr. Rudin) of Forensic DNA Consulting. In her report, Dr. Rudin reviews and comments on the significance of the DNA test data provided by DFS in its certificates of analysis.

Dr. Rudin confirms that her assessments of both jeans crotch samples concords with the March 2010 COA, August 2017 COA, and September 2017 COA in concluding that the sperm fraction profiles from both jeans crotch samples are clearly the same and the profile is a single source male contributor who is not Scott or RN.

Dr. Rudin notes that the March 2010 COA reports that the DNA types developed from the vaginal swab are of "no value." Noting that the DFS vaginal swab DNA testing actually obtained DNA typing results at three loci, which are specifically identified in the March 2010 COA, she contends that the "no value" statement is a "policy statement and not a scientific conclusion." That policy statement may be based upon DFS protocol, which directs that "at least four callable loci" are required to "include an individual."

Dr. Rudin notes that the DFS Forensic Biology Section Procedures Manual protocol does not define or provide specific guidelines for when a profile is of "no value." She acknowledges that the protocol directs that "at least four callable loci" are required to "include an individual." However, the same section of the protocol also states that a "partial profile . . . may be used for

15

elimination purposes." She concludes that "[i]n this instance, then, this [protocol] should have resulted at least in a statement [in a DFS COA] that, assuming a single source, the vaginal swab partial DNA profile could not have originated from Scott." Dr. Rudin states that the DFS certificates of analysis are incomplete because they fail to comment regarding relevant data contained in the report.

Regarding the DNA types developed by DFS from the vaginal swab, Dr. Rudin also states that "[a]lthough less information is exhibited in this profile it is critical to note that the results obtained concord with the jeans crotch profiles," noting the matching alleles. Comparing results listed by DFS in the March 2010 COA typing results table, she concludes that the results are clear that "a redundant male single-source profile was obtained from sperm fractions of the two different jeans crotch samples and the vaginal swab." Thus, the "redundant male profile" from sperm that cannot be attributed to RN, the victim's consensual partner, or to Scott, is found in both the jeans crotch samples and the vaginal swab of the victim.

Additionally, apparently considering the Commonwealth's argument that the sperm in the crotch of the victim's jeans could have been deposited there through the jeans being laundered, Dr. Rudin observes that "[w]hile spermatozoa have been shown to survive laundering under certain conditions, this typically results in isolated scattered sperm rather than a cohesive stain" as found in the crotch of JD's jeans. She states that a visible stain, positive acid phosphatase result, and a concentration of many intact sperm cells would not be expected after laundering.

In his brief, Scott argues that he has proven by "clear and convincing" evidence that no rational finder of fact would find him guilty beyond a reasonable doubt after considering the DNA test results, the trial testimony, and the additional information he has proffered. Scott contends that the facts of the case clearly show that JD was raped by a single perpetrator. The

16

DNA testing performed by the Commonwealth has conclusively eliminated him as a contributor to the male DNA in the semen stain left in the crotch of the jeans worn by the victim immediately after she was raped and the sperm detected on a vaginal swab of the victim collected within hours of the attack, which is all the physical evidence available in this case. Thus, Scott asserts that no rational factfinder would find him guilty beyond a reasonable doubt of the burglary, sodomy, and rape charges.

The Commonwealth was offered an opportunity to respond to Scott's opposition to the motion to dismiss, and filed the "Commonwealth's Response" on June 12, 2018.[6] In its response, the Commonwealth does not proffer any additional evidence, but it claims that Scott has not proven his actual innocence by clear and convincing evidence, because the probative value and admissibility of the DNA evidence proffered by Scott is questionable.

The Commonwealth argues that Scott is not free to rely upon an expert other than one from DFS in analyzing the data produced by DFS. Dr. Rudin's opinions are therefore not entitled to consideration by this Court. Further, it contends that Scott's argument concerning his exoneration relies on the unproven assumption "that those jeans are linked to the rape."

The Commonwealth argues that the new biological evidence is not exculpatory, because Scott has failed to prove that the tested jeans are "tied to the crime." Although the chain of custody of the jeans sample was stipulated to at trial and the Commonwealth's November 1975 COA concerning the serological testing on that sample was admitted into evidence without objection, the Commonwealth claims that Scott's petition fails to prove that the tested jeans are

---

[6] This Court entered an order on May 29, 2018 providing the Commonwealth the opportunity to respond to the Petitioner's "Opposition to Commonwealth's Motion to Dismiss the Petition for Writ of Actual Innocence – Reply," which attached numerous affidavits and other exhibits as evidentiary proffers.

related to the attack. In support of its position, the Commonwealth notes that at trial Investigator Wilkins stated, "The jeans were handed to me by personnel in the apartment that morning." It notes that the Commonwealth only stipulated that "the jeans in question are the victim's and were taken from her apartment that morning," and no additional evidence was presented at trial regarding the "provenance" of the jeans prior to Wilkins receiving them. It notes that no DNA testing proves JD's connection to the stain on her jeans.

ANALYSIS

Under Article VI, Section 1 of the Constitution of Virginia and Code § 19.2-327.2, this Court has original jurisdiction to issue a writ of actual innocence based on previously unknown or untested human biological evidence of the petitioner's actual innocence. A petitioner for such a writ must allege:

> (iv) that the evidence was not previously known or available to the petitioner or his trial attorney of record at the time [of trial] . . . ;
>
> (v) the date the test results under [Code] § 19.2-327.1 became known to the petitioner or any attorney of record;
>
> (vi) that the petitioner or his attorney of record has filed the petition within 60 days of obtaining the test results under [Code] § 19.2-327.1;
>
> (vii) the reason or reasons the evidence will prove that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt; and
>
> (viii) for any conviction or adjudication of delinquency that became final in the circuit court after June 30, 1996, that the evidence was not available for testing under [Code] § 9.1-1104.

Code § 19.2-327.3(A).

> This Court shall grant the writ and vacate the petitioner's conviction,
>
> only upon a finding of *clear and convincing evidence* that the petitioner has proven all of the allegations contained in clauses (iv) through (viii) of subsection A of [Code] § 19.2-327.3, and upon a finding that *no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt* . . . .

18

Code § 19.2-327.5 (emphases added).

Here, it is uncontested that Scott has pled the threshold allegations required by Code § 19.2-327.3(A)(iv)-(viii). However, the parties disagree on whether this Court should find that Scott has provided this Court clear and convincing evidence that "no trier of fact would have found proof of guilt . . . beyond a reasonable doubt."

Clear and convincing evidence is

[t]hat measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. *It does not mean clear and unequivocal.*

*In re Watford*, 295 Va. 114, 124 n.12 (2018) (quoting *Fred C. Walker Agency, Inc. v. Lucas*, 215 Va. 535, 540-41 (1975)) (emphasis added).

The General Assembly's inclusion of the term "would" in the "no rational trier of fact" standard requires this Court to examine "the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Id.* at 124 (citation and internal quotation marks omitted). This Court is "required to look beyond whether the evidence is sufficient to sustain the conviction," and "examine the likelihood of a reasonable juror finding the petitioner guilty beyond a reasonable doubt once all of the evidence has been fairly considered." *Id.*

This Court must thus review the "totality" of the evidence under the "clear-and-convincing" standard, and "draw [its] conclusion from a hypothetical new trial." *In re Brown*, 295 Va. 202, 229 (2018) (citation and internal quotation marks omitted). The "totality" of the evidence is not just the "newly discovered DNA evidence," but also includes "any records from the original case, the evidence presented at the original trial, the newly discovered biological evidence, [and] any additional factual proffers made by the petitioner or the Commonwealth."

19

*Watford*, 295 Va. at 125. Sitting as a court of original jurisdiction, this Court "has the same authority to weigh and evaluate documentary and physical evidence as a trial court would have." *Haas v. Commonwealth*, 283 Va. 284, 292 (2012).

The Commonwealth argues that this Court cannot consider Dr. Rudin's report because it contains expert opinions that DFS did not authorize. It also asserts that, even though it does not dispute the accuracy of the DFS DNA testing of the biological evidence, Scott has failed to prove that the jeans that were tested were linked to the rape. Thus the Commonwealth claims that Scott has failed to carry his burden of proving that the newly-discovered biological evidence, by "clear and convincing evidence," shows "that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt."

### A. Admissibility of Dr. Rudin's Analysis

In *Brown*, we stated that "the legislature has given DFS the role of expert gatekeeper with respect to DNA test results offered in support of actual innocence petitions." 295 Va. at 224. The stated legislative underpinning for that statement is Code § 19.2-327.1, which requires that "'the testing requested involve[ ] a scientific method employed by the Department of Forensic Science,'" and that tests be performed by DFS pursuant to its standards. *Id.* at 222 (quoting Code § 19.2-327.1). In *Brown*, this Court did not consider a petitioner's privately-contracted test result because DFS did not review the test results or issue a COA. *Id.* at 226.

However, non-DFS experts are not prohibited from analyzing and interpreting the DNA test results certified by the DFS. Unlike in *Brown*, in this instance, the DNA testing involved was performed by DFS pursuant to its standards. Dr. Rudin did not conduct any tests. Dr. Rudin's conclusions and analyses are based on test results, data, and certificates of analysis produced by DFS. There is no statutory or other prohibition that would prevent a trier of fact

20

from hearing such testimony from a qualified non-DFS expert witness in an actual innocence case. In a "hypothetical trial," a trier of fact would be allowed to hear Dr. Rudin's expert testimony, if she were qualified as required by the Rules of Evidence to present that testimony, and this Court will consider her proffered report in ruling upon Scott's petition.

### B. Relevance of DNA Testing of Jeans

The Commonwealth opposes Scott's petition based upon its claim that the DFS DNA test results are not probative of Scott's innocence, because Scott has not proven that the jeans tested by DFS are linked to the rape. In support of its position, the Commonwealth states that in his trial testimony, Investigator Wilkins did not identify from whom he received the jeans he collected from JD's apartment. Further, it notes that the Commonwealth only stipulated at trial that "the jeans in question are the victim's and were taken from her apartment that morning." The Commonwealth also states that "no one at trial asked about the collection of the clothing," and that the DNA analysis of the stain on the jeans does not conclusively contain DNA from JD. Thus, the Commonwealth concludes that Scott has not proven that the stain on the jeans is related to JD's rape. We disagree.

Investigator Wilkins collected the jeans on the morning of the rape. In his affidavit, Investigator Wilkins states that "this unit" in his 1975 supplementary report referred to himself. His July 1975 report would thus read: "[I] collected the clothing that the victim wore during the attack and the clothing the victim put on after the attack." He also stated in his affidavit that standard operating procedure would have been for him to personally collect the evidence from the scene, and that he would only collect evidence relevant to JD's case. JD stated in her phone interview with Detective Horn that she did not doubt that she put on a pair of jeans right after the

21

attack and before she left the bedroom. The September 1975 COA describes the jeans Investigator Wilkins collected as the "jeans worn by victim."

At trial, the Commonwealth stipulated to the chain of custody of the jeans and, more importantly, did not object on relevancy or any other grounds when the September 1975 COA concerning the serological test on the sample from the jeans, designated in that COA as "jeans worn by victim," was admitted into evidence. In fact, the Commonwealth also introduced the November 1975 COA into evidence. Therefore, at trial the Commonwealth waived any objection to the chain of custody, relevance, or admissibility of the samples from the "jeans worn by victim."

In a "hypothetical new trial," based on the proffered testimony of JD or Investigator Wilkins, the subsequent DNA testing of those same samples would be relevant and admissible into evidence.

In considering the totality of the evidence, we must evaluate the Commonwealth's assertions concerning factors that it claims denigrate the probative value of the DFS DNA results from the jeans samples. The Commonwealth notes that the presence of the victim's DNA was not confidently identified to be present in the semen stain from her jeans and that the semen stain may have been deposited on the jeans from laundering. We give both assertions little weight in evaluating the probative value of the DFS DNA testing results.

It is undisputed that the jeans were worn by JD and belonged to her whether her DNA was present in the stain or not. The lack of her DNA in the stain sample can be explained by the age and possible contamination of the samples. Further, the DNA of sperm found on the victim's vaginal swab, which was taken within hours of the rape, is concordant with the DNA of the sperm from the semen stain found on the crotch of the victim's jeans.

22

It seems unlikely that the semen stain on the jeans was placed there by laundering. The police officer collected the jeans because he believed that the victim had worn them after the rape. The victim does not doubt that to be so. The crime lab noted a stain in the crotch of the jeans and took a sample from it. The stain was large and visible enough that upon retesting, Burton was able to take a sample from the edge of the semen stain rather than from the center of the semen stain where the first sample was taken, because she hypothesized that "this is the part which would have dried before it was sealed." We also note the concentration of semen in that place on the jeans, the visible stain that the Commonwealth's expert hypothesized may have been wet when the jeans were collected, and a positive acid phosphatase result would indicate that the stain was not deposited on the jeans by laundering.

*C. Summary*

This Court is required to examine the "probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Watford*, 295 Va. at 124 (citation and internal quotation marks omitted).

At trial, it was established that JD, the victim, was attacked by a single perpetrator. JD testified that the drapes were drawn, there was little light in her room, and she did not get a good look at her attacker. However, she was able to assist the police in creating a composite sketch of her attacker. In a second photo line-up presented to her a couple of months after the crimes, the victim identified Scott as her rapist. She identified him at trial, and she has not retracted her testimony.

At trial, Scott presented the September 1975 COA regarding a sample from a semen stain from the crotch of "jeans worn by victim." This COA was admitted into evidence without objection. The Commonwealth also introduced into evidence without objection the November

23

1975 COA concerning a second sample taken from the semen stain in the crotch of those same jeans. The two serological COAs were contradictory. Scott also presented alibi witnesses stating that he was at their home on the night of the rape.

Based upon the victim's eyewitness identification, the jury returned a verdict of guilty.

Subsequently, DFS did a DNA test on those same samples from the semen stain found in the crotch of the jeans worn by the victim. The DNA testing developed a DNA profile that revealed the same contributor for the sperm fractions found in both samples. Further, DFS DNA testing conclusively eliminated Scott and RN—the victim's boyfriend—and the only person the victim was having consensual sex with at the time as the contributors of the sperm found in the crotch of the victim's jeans.

DFS also did a DNA test on a vaginal swab taken from the victim within hours of the rape. The partial DNA profile DFS developed from the vaginal swab is concordant with the DNA profile found in the semen stain sample from the victim's jeans. Thus, a male profile from sperm that cannot be attributed to Scott or RN is found in both the jeans crotch samples and the vaginal swab of the victim.

Upon reviewing the totality of the evidence, including records from the original case, the evidence presented at the original trial, the newly-discovered biological evidence, and the proffers made by the petitioner and the Commonwealth, the Court finds that Scott has proved, by clear and convincing evidence, all of the allegations required under Code § 19.2-327.3(A) and that no rational trier of fact would have found him guilty beyond a reasonable doubt in that he has been scientifically proven by DNA analysis to not be the source of the sperm found on the victim's jeans or the male DNA found on the vaginal swab obtained from the victim.

24

CONCLUSION

Accordingly, the Court hereby grants Scott's petition for writ of actual innocence, vacates

his convictions, and directs that the writ be issued.

*Petition granted.*